IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTINA PAOLI,                          )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        Civil Action No. 12-66-GMS-CJB
                                          )
TROOPER STETSER, et al.,                  )
                                          )
                Defendants.               )

## REPORT AND RECOMMENDATION

Plaintiff Christina Paoli ("Plaintiff") filed this civil rights action pursuant to 42 U.S.C. §

1983 ("Section 1983") against Defendants Trooper Ashley Stetser, Corporal Kimberly Layfield,

Trooper Joshua Rowley, Corporal Troy Ralston, Corporal Carlisle, Trooper James O'Neil,

Corporal Matthew Warrington, Sergeant John Barnett, Sergeant Michael Whaley (retired),

Lieutenant Kenneth Hardy (retired), Captain Glen Dixon (collectively, the "Individual

Defendants") and Delaware State Police ("DSP")—Troop 7 ("Troop 7").[1]  Presently pending

before the Court is Defendants' Motion for Summary Judgment ("Motion").  (D.I. 52)  For the

reasons set forth below, the Court recommends that the Motion be GRANTED-IN-PART and

DENIED-IN-PART.  Specifically, the Court recommends that Defendants' Motion be

GRANTED as to all claims except for the Section 1983 illegal search and seizure claim asserted

against Defendant Rowley.

## I.    BACKGROUND

---

[1]      Plaintiff's Complaint does not list the first names of the Individual Defendants, but to the extent that those names are evident in the record, the Court has inserted them here. Additionally, with regard to Corporal Carlisle, it appears that "Carlisle" is the correct spelling of this Defendant's last name, (D.I. 53 at 3), which was incorrectly spelled as "Carlyle" by Plaintiff in the Complaint, (D.I. 1 at 1).  As such, the Court will use the correct spelling herein.

A.     **Factual Background**

Plaintiff's twenty-two page Complaint presents her claims in a lengthy, narrative fashion,

which lacks an easily discernible chronology and is generally difficult to navigate. Nevertheless,

in order to properly review the issues raised by Defendants' Motion, it is necessary to first

attempt to understand Plaintiff's claims and the underlying factual background relating to those

claims that is properly before the Court in the record. The Court sets this out below, utilizing the

statements in Plaintiff's Complaint and the facts listed in other filings of record, including sworn

affidavits submitted by several of the Individual Defendants.[2]

The Court will organize the facts based on Plaintiff's allegations against each Individual

---

[2]      The Court includes allegations from Plaintiff's Complaint in this section and in
Section III below in discussing the merits of the claims. Plaintiff verified, under penalty of
perjury, her factual allegations in her Complaint. (D.I. 1 at 22) The United States Court of
Appeals for the Third Circuit has indicated that verified complaints may be treated as affidavits
in opposition to summary judgment. *Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003); *Davis
v. Carroll*, Civ. No. 03-131-LPS, 2012 WL 2880542, at *3 & n.2 (D. Del. July 13, 2012). If
statements contained in a verified complaint "conflict with other evidence and offer a different
version of events that a reasonable jury could find was true, a genuine issue of fact may have
been created." *Davis*, 2012 WL 2880542, at *3 n.2 (citing cases).

Additionally, the Court includes facts and statements gleaned from police reports and
affidavits submitted in support of warrant applications in this section and in Section III below.
Both parties cite to this type of evidence, and neither party suggests that any portion of such
evidence should not be relied upon for purposes of summary judgment. *See Felkner v. Werner
Enters. Inc.*, Civil Action No. 13-2189, 2014 WL 1013474, at *2 n.4 (E.D. Pa. Mar. 14, 2014)
(considering summary judgment motion and explaining that court could properly consider police
reports in record and statements contained therein because both the police officers and witnesses
interviewed could testify regarding their personal knowledge as reflected in the reports);
*Rotenberg v. Lake Charter Bus Corp.*, Civ. No. 12-2155 (FLW), 2014 WL 284255, at *6 n.8
(D.N.J. Jan. 24, 2014) (considering summary judgment motion and explaining that a police
report is admissible evidence under the "public records" exception to the hearsay rule) (citing
Fed. R. Evid. 803(8)). Additionally, the Court is not aware of any instance in which resolution of
this Motion turns on reliance on a portion of such a record that could be considered to be likely
inadmissible at trial.

2

Defendant. In doing so, it will refer to the Individual Defendants in the order that they are addressed in Defendants' briefing. (Unfortunately, this means that the events listed below will not always proceed in a chronological fashion.).

### 1.   Defendant Layfield

Defendant Layfield is a Corporal in the Delaware State Police ("DSP"), having been employed as a Trooper and Corporal with DSP Troop 7 in Lewes, Delaware since 1996. (D.I. 54 at A24, at ¶ 1)  On March 24, 2007, Defendant Layfield contacted an individual named Paul Scott ("Scott") who had requested police assistance (the "March 24, 2007 incident"). (*Id.* at ¶ 2) Scott was renting a room from Plaintiff in a residence located in Rehoboth Beach, Delaware. (*Id.*; D.I. 42 at 5)  Scott informed Defendant Layfield that Plaintiff had evicted him and would not allow him to retrieve his property. (D.I. 54 at A24, at ¶ 2)  Defendant Layfield accompanied Scott to the residence. (*Id.*)  Although there was a "No Trespassing" sign posted on the front door stating that "Troop 7 police [were not permitted] inside unless [Plaintiff] or [a man named] [Walter] Stucki ["Stucki"] [was present][,]" and neither Plaintiff nor Stucki were present, Defendant Layfield entered the residence with Scott and remained there while Scott gathered his belongings.[3] (D.I. 42 at 5; D.I. 43 at 1; D.I. 54 at A24, at ¶ 2)

Plaintiff alleges that Scott stole certain unidentified items while he was inside of the residence with Defendant Layfield. (D.I. 1 at 3; D.I. 42 at 5)  Plaintiff called the police to report the alleged theft, and claims that Layfield refused to take a report on the basis that it was a civil matter. (D.I. 1 at 3; D.I. 42 at 5)

Approximately thirty minutes later, Scott and his mother went to Troop 7 and informed

---

[3]     Stucki owned rental property that Plaintiff managed for him. (D.I. 1 at 16-17)

Defendant Layfield that Plaintiff had called Scott on his cell phone and left a "disturbing" voicemail message. (D.I. 54 at A24, at ¶ 3)  In the voicemail message, Plaintiff stated that she was going to have "[Scott] and [his] mom's ass arrested[,]" demanded that Scott return her call in fifteen minutes or she would have him arrested, called Scott a"f—ing thief" and stated that she did not "care if the f—ing cops were with [Scott] or not[.]" (*Id.*) Based on this complaint, Defendant Layfield obtained an arrest warrant for Plaintiff's arrest on the charge of harassment, a violation of Del. Code tit. 11, § 1311. (*Id.* at ¶ 3 & ex. 1) Defendant Layfield asserts that she had no further contact with Plaintiff and was not involved in Plaintiff's arrest on the harassment warrant. (*Id.* at ¶ 3)

Plaintiff represented herself during trial on the harassment charge and was ultimately found not guilty. (D.I. 1 at 3, 9; D.I. 42 at 5; D.I. 47 at 53)  During the trial, an individual named Bonnie Homburger ("Homburger") testified that she heard Defendant Layfield tell Plaintiff that Plaintiff's arrest was "payback for Paoli filing a complaint against Police Officer [Bruce] Ritter" or "payback for getting [Police Officer] Ritter suspended without pay, taking food from his family's table and suing the police." (D.I. 1 at 3, 9; D.I. 60 at ¶ 3(a))[4] Defendant Layfield did not receive any sanction or reprimand as a result of Homburger's testimony. (D.I. 60 at ¶ 3(a))

A little over three months after the March 24, 2007 incident, on July 2, 2007, Plaintiff filed a civil rights action in this Court against the City of Lewes, Delaware, the Lewes Police Department, and Bruce Ritter. (D.I. 54 at A86-A88) Plaintiff's Complaint alleged that Officer Ritter was disciplined and suspended at some point between July 2006 and June 2007 for

---

[4]     It appears that Homburger gave this testimony on June 13, 2007. (D.I. 1 at 3) Homburger reiterated the testimony during a 2009 deposition. (*Id.*; D.I. 60 at ¶ 3(a))

violating Plaintiff's rights. (*Id.* at ¶¶ 11-12; *see also* D.I. 1 at 3)   The parties to the lawsuit

reached a settlement on or about October 7, 2009. (D.I. 1 at 3; *see also* D.I. 47 at 85)

### 2.   Defendant Carlisle[5]

Plaintiff asserts that she was harassed and threatened by a tenant, Latisha Breakhouse

("Breakhouse"). (D.I. 1 at 17-18)   On January 1, 2009, Plaintiff spoke to a Corporal Archer and

a dispatcher at two separate times regarding threats and verbal abuse made by Breakhouse and

Breakhouse's boyfriend, but no charges were filed. (*Id.* at 18)   Again on January 5, 2009, when

Plaintiff requested police assistance regarding threats by Breakhouse, Troop 7 allegedly refused

to help Plaintiff or investigate further (the "January 5, 2009 incident"). (*Id.* at 17-18)   Prior to

this date, Plaintiff asserts that Troop 7 compiled police reports regarding Breakhouse's

harassment of Plaintiff; she alleges that Defendant Carlisle took such a report at some

unidentified date "prior" to December 24, 2008. (*Id.* at 18)

### 3.   Defendant Stetser

Defendant Stetser has been employed by the DSP since 2010, and is currently a Trooper

First Class. (D.I. 54 at A42, at ¶ 1)   On March 5, 2011, Plaintiff was charged with three counts

of harassment, a violation of Del. Code tit. 11, § 1311, in connection with a dispute between

Plaintiff and three males:  Drew Imperial ("Imperial"), Cameron Freeman ("Freeman"), and

Benjamin Outten ("Outten" and collectively, the "male subjects"). (D.I. 1 at 2, 12, 18; D.I. 54 at

A57)   On that date, Defendant Stetser was assigned to patrol at Troop 7, with Defendant Ralston

---

[5]      In her Complaint, Plaintiff included a section entitled "Parties" in which she listed
each Defendant, except for Defendant Carlisle, and set out a narrative for each listed Defendant
that described Plaintiff's allegations against that Defendant. (D.I. 1 at 1-7)   Defendant Carlisle is
not listed in the "Parties" section; he is instead mentioned only once in Plaintiff's Complaint, in
the section entitled "Venue." (*Id.* at 18)

supervising her. (D.I. 54 at A42, at ¶ 2; *see also* D.I. 1 at 2, 4)  Defendant Stetser was dispatched

to investigate a terroristic threatening complaint at the Summerlyn Condominiums ("Summerlyn

Condos"), located on Summerlyn Drive in Lewes, Delaware.  (D.I. 54 at A42, at ¶ 3; *id.* at A47)

It is not clear from the record who called in the complaint, although Plaintiff appears to allege

that she and two others—Michael Abernathy ("Abernathy") and Lois Colletti ("Colletti")—all

made separate calls to complain about the male subjects.  (D.I. 1 at 18)

　　　According to Defendant Stetser's "Initial Crime Report" ("Crime Report"), the male

subjects alleged that they had resided in Summerlyn Condos Unit 303 ("Unit 303"), which they

sub-rented from Plaintiff, for the past several months.  (D.I. 54 at A48; *see also id.* at A42, at ¶ 3)

They informed Defendant Stetser that they had paid their share of the rent for the month of

March, and were now attempting to rent the property directly from the owner, Loretta Ventura

("Ventura").  (*Id.* at A48)

　　　The dispute between Plaintiff and the male subjects began the evening before, on March

4, 2011, when Freeman alleged that Plaintiff broke into Unit 303 ("the March 4, 2011 incident").

(*Id.*)  According to the Crime Report, Plaintiff acknowledged that she had broken into the

residence to retrieve medication after the male subjects had locked her out.  (*Id.*)  While there,

she asserted that Freeman and Outten began making offensive statements to her, such as

"[y]ou're a cripple."  (*Id.* at A49; *see also id.* at A42, at ¶ 4)  Defendant Stetser also noted in the

Crime Report that Plaintiff "made it appear as though [Drew Imperial] was present for these

altercations for the majority of the night."  (*Id.* at A49)  Plaintiff contacted Colletti at some point

that evening; Colletti later arrived at Unit 303 and began to take notes, at Plaintiff's instruction,

as to the types of statements that Freeman and Outten were making to Plaintiff.  (*Id.* at A49-A50)

Freeman and Outten eventually left Unit 303 and went to a bar; they were singing and yelling when they returned home approximately one half hour later. (*Id.*)

Plaintiff alleges that, at some point during the above-referenced events on March 4, 2011, she and Colletti contacted Troop 7 and reported that Outten had made certain terroristic threats against her. (D.I. 1 at 18) She asserts that she was simply instructed to call 911 in the future if Outten made additional terroristic threats. (*Id.*)

When Defendant Stetser responded to Unit 303 on March 5, 2011, her Crime Report indicates that she made contact with Abernathy; Abernathy reported that he had been helping Plaintiff move her belongings to another unit of Summerlyn Condos when Outten made derogatory statements to him and told him to leave the unit. (D.I. 54 at A47-A48) According to the Crime Report, Abernathy stated that he feared that Outten would damage his vehicle, which prompted him to call the police. (*Id.* at A48) Defendant Stetser wrote in the Crime Report that as she was speaking with Abernathy, Plaintiff continually interrupted the conversation, asserting that Plaintiff had sub-rented the unit to the male subjects, who were only supposed to remain there until "she left the hospital." (*Id.*)

After speaking with Freeman and Imperial, Ventura, Plaintiff and Abernathy, Defendant Stetser contacted Plaintiff and advised her that neither Plaintiff nor the male subjects were going to be told to leave the residence. (*Id.*) Defendant Stetser thereafter escorted Plaintiff and Colletti into the unit and while there, observed Freeman and Imperial being very cooperative and attempting to avoid a further altercation by remaining inside their bedrooms. (*Id.* at A48-A49) However, Defendant Stetser wrote that Plaintiff then made several remarks loud enough for Freeman and Imperial to hear, including comments such as, "I'm going to say this loud enough

7

so they can hear it." (*Id.* at A49; *see also id.* at A42, at ¶ 5)  At certain points in time, according

to Defendant Stetser, both Freeman and Imperial "left their rooms and engaged words with

[Plaintiff] based on statements she had just made about them and [Outten]." (*Id.* at A49)

Defendant Stetser wrote that Plaintiff "refused to cooperate with [her] and to refrain from making

statements against all three [male subjects] on several occasions." (*Id.*)  She wrote that Freeman

and Imperial seemed uneasy about the prospect of Plaintiff remaining in the residence that

evening, nervous that Plaintiff would continue to make statements towards them that would

alarm them or cause them to respond. (*Id.*)

Defendant Stetser also interviewed Colletti regarding the events of the previous evening.

Defendant Stetser noted that during the entire interview, although she had advised Plaintiff that

she wanted to speak only with Colletti, Plaintiff repeatedly attempted to interject. (*Id.* at A50)

Colletti informed Defendant Stetser that before the interview, Plaintiff instructed Colletti to write

a statement regarding the March 4, 2011 incident. (*Id.*)  Defendant Stetser wrote in her Crime

Report that "[t]his is even further proof that [Plaintiff] has complete control over [Colletti]" and

Colletti "basically does whatever [Plaintiff] tells her to." (*Id.*)[6]

Defendant Stetser thereafter examined Colletti's written notes.  When she did so, she

noticed that Colletti referred to herself in the third person; this led Defendant Stetser to suspect

that Plaintiff had actually written the notes herself. (*Id.*)  Accordingly, Defendant Stetser asked

Colletti to write a sentence contained in the notes on a separate piece of paper. (*Id.*; *see also* D.I.

---

[6]      By way of example, Defendant Stetser noted that at some point before Colletti's
interview, Defendant Stetser had told Plaintiff that one had to threaten someone's life in some
way in order to be arrested for terroristic threatening; according to the Crime Report, this
prompted Plaintiff to instruct Colletti to write down that Outten had threatened her the prior
evening. (*Id.*; *see also id.* at A42, at ¶ 5)

1 at 13) The handwriting "matched perfectly [to the handwriting on the notes]." (D.I. 54 at A50;

*see also* D.I. 1 at 13) Though Defendant Stetser thus concluded that Colletti did in fact write the

notes herself, Defendant Stetser nevertheless documented in the Crime Report her belief that

Plaintiff had been telling Colletti what to write on the evening of March 4, 2011, which had

caused Colletti to write the notes in the third person. (D.I. 54 at A50) Ultimately, Defendant

Stetser documented her observation that Plaintiff appeared to have "complete control over

[Colletti], causing her to become an unreliable witness." (*Id.*)

Defendant Stetser next obliged Plaintiff's request that Defendant Stetser dust for

fingerprints in Plaintiff's bedroom. (*Id.* at A51) There was a sticky note posted outside of the

bedroom instructing everyone to stay out; Plaintiff explained it was there because the male

subjects were not supposed to be inside of Plaintiff's bedroom at any point. (*Id.*) Defendant

Stetser was unable to locate any latent fingerprints. (*Id.*) During this process, Defendant Stetser

spilled black powder on Plaintiff's comforter and rug. (D.I. 1 at 13; D.I. 54 at A51) Defendant

Stetser contends that this was an accident, but Plaintiff alleges that Defendant Stetser spilled the

powder purposefully. (D.I. 1 at 13; D.I. 54 at A43, at ¶ 5; *id.* at A51-A52)

Defendant Stetser alleges that throughout her investigation, although she did what she

thought was "right and necessary at the time[,]" Plaintiff repeatedly threatened her, asserting that

Plaintiff intended to contact attorneys or Defendant Stetser's supervisors to complain about her

conduct. (D.I. 54 at A51) At the conclusion of her investigation, Defendant Stetser and

Defendant Ralston spoke with a Sergeant Windsor, who advised Defendant Stetser to seek a

judge's input on an arrest warrant for Plaintiff. (*Id.*) A judge at Justice of the Peace Court 3

advised Defendant Stetser that she had enough probable cause to charge Plaintiff with three

counts of harassment—one against each of the male subjects. (*Id.* at A51, A57)  Accordingly,

Defendant Stetser obtained a warrant on those charges against Plaintiff, and returned to the

Summerlyn Condos with Defendant Ralston and Sergeant Windsor in an attempt to apprehend

Plaintiff. (*Id.* at A51)

Defendant Stetser ultimately arrested Plaintiff at her residence on March 5, 2011, after

Plaintiff attempted to hide in her bedroom. (*Id.* at A43, at ¶ 6)  Defendant Stetser stated in the

Crime Report that Plaintiff was given plenty of time to gather her belongings and locate her

medication before being removed from the residence. (*Id.* at A52)  Plaintiff appears to dispute

this, alleging that her medication was withheld for almost two hours. (D.I. 1 at 13)

Plaintiff was eventually taken to Troop 7 where she was arraigned via video on March 6,

2011. (*Id.* at A53; *see also id.* at A60, at ¶ 3)  A judge placed a "no contact" order on Plaintiff,

prohibiting her from any contact with the male subjects, but giving her permission to reside in

Unit 305, a unit located nearby to Unit 303 (where the male subjects were living). (*Id.* at A53;

*see also id.* at A60, at ¶ 3)

Plaintiff had to go directly to the hospital after being released from Troop 7 (though she

provides no further details about this hospital visit). (D.I. 1 at 13-14)  All of the charges against

her were ultimately dropped. (*Id.* at 2)

### 4.  Defendant Ralston

Defendant Ralston is a Corporal in the DSP who has been employed as a Trooper and

Corporal for the past six years. (D.I. 54 at A74, at ¶ 1)  On December 24, 2008, Defendant

Ralston filed a police report in response to Plaintiff's complaint that Breakhouse had repeatedly

threatened her. (D.I. 1 at 18)  Defendant Ralston did not arrest Breakhouse for the incident, and

wrote "unfounded" in the status section of his report. (*Id.* at 4)

Defendant Ralston was also the Field Training Officer for Troop 7 assigned to supervise Defendant Stetser on March 5, 2011. As such, he was present during Stetser's investigation of the March 5, 2011 incident discussed above. (*Id.* at 4; D.I. 54 at A42, at ¶ 2; *id.* at A74, at ¶ 2)

### 5.    Defendant Rowley

Defendant Rowley has been employed as a Trooper in the DSP for over two years, and is assigned to Troop 7. (D.I. 54 at A34, at ¶ 1)  Defendant Rowley was involved in arresting Plaintiff on two occasions, on March 7, 2011 and July 21, 2011. (*Id.* at ¶¶ 2-3)

On March 7, 2011 (the "March 7, 2011 arrest"), Defendant Rowley was assigned to report to the Summerlyn Condos to assist other officers in arresting Plaintiff for her alleged violation of the "no contact" order issued in connection with the March 5, 2011 incident. (*Id.* at ¶ 2) On March 7, Plaintiff fled from her dwelling at Unit 305 prior to the arrival of Troop 7 officers. (*Id.* at A66)  At some point thereafter, DSP officers set up a perimeter on the property to try to locate Plaintiff. (*Id.* at A34, at ¶ 2)

According to Defendant Rowley, approximately 15-20 minutes after Plaintiff fled from the officers, DSP dispatch advised him and other officers at the Summerlyn Condos that Plaintiff was currently talking on a phone line located in the complex's north parking lot. (*Id.*)  Plaintiff's account differs—she asserts that this telephone conversation with DSP dispatch lasted for approximately four minutes and occurred approximately 25 minutes prior to her arrest. (D.I. 1 at 5)

Defendant Rowley claims that after getting word that Plaintiff was in the north parking lot, he thereafter observed a motor home in that lot. (D.I. 54 at A34, at ¶ 2)  According to

11

Plaintiff, the motor home belonged to her, (D.I. 1 at 2), though there is no indication in the record that Defendant Rowley or the other officers with him knew this at the time.

In her Complaint, Plaintiff alleges that both the front door and side door of the motor home were locked, that a mattress covered the locked side door and that curtains covered the view from all of the windows. (*Id.*) Accordingly, Plaintiff alleges that it was impossible for an observer to know that Plaintiff was inside. (*Id.*) Plaintiff asserts that Defendant Rowley next "illegally broke into" Plaintiff's locked motor home without permission or a search warrant, and that several witnesses saw this. (*Id.*)[7]

Defendant Rowley, however, asserts that a door to the motor home was open and that a mattress was "propped on an angle at the door." (D.I. 54 at A34, at ¶ 2) He states that he could see into the door, and that he observed a walker that he believed belonged to Plaintiff. (*Id.*) Defendant Rowley asserts that he could also hear movement inside of the motor home, but that when fellow DSP officers called out for Plaintiff to exit the motor home, Plaintiff did not respond. (*Id.*) Sergeant Fuscellaro then directed Defendant Rowley to enter the motor home along with other officers to remove Plaintiff and arrest her. (*Id.*) Defendant Rowley entered the motor home and found Plaintiff there. (*Id.*) He states that he did not lay a hand on Plaintiff, and instead that other DSP officers arrested her. (*Id.*)

On July 21, 2011, Defendant Rowley again responded to the Summerlyn Condos (the "July 21, 2011 incident"), this time to Unit 111, regarding a theft report made by a Leonard

---

[7]    Plaintiff asserts in her Complaint that "the investigative narrative dated 3/11/11 proves that [Defendant] Rowley violated police procedures and the law by entering [the] motor home." (D.I. 1 at 2) However, Plaintiff has not provided the Court with this document, and it does not appear to otherwise be in the record.

Marchone ("Marchone"). (D.I. 54 at A35, at ¶ 3)  Marchone was subleasing property from

Plaintiff. (*Id.*)  Marchone advised Defendant Rowley that he had borrowed money from Plaintiff,

but then moved out of her property and that, after he did so, he did not receive his security

deposit back from Plaintiff. (*Id.*)  Marchone reported that Plaintiff had been calling him

repeatedly and had come to his residence that day, all in an effort to harass him about the

borrowed money. (*Id.*; *id.* at A39)  While Marchone was working on the back porch of the

property, he alleged that Plaintiff entered his home through an unlocked front door without

permission. (*Id.* at A35, at ¶ 3)  Marchone asserted that Plaintiff then threatened to have him

followed if he tried to go to Florida, and stated that "'Frank [was] waiting around the corner to

beat his ass if he tried to leave the apartment.'" (*Id.*)  Plaintiff also allegedly told Marchone

"'let's see how far you get without a tag on your car.'" (*Id.*)  Marchone advised that after

Plaintiff left his residence, he later discovered his license plate was missing from his car. (*Id.*)

Defendant Rowley asserts that he thereafter unsuccessfully attempted to contact Plaintiff

at her home and by telephone. (*Id.*)  Without speaking to Plaintiff or any other witness,

Defendant Rowley obtained an arrest warrant for Plaintiff on charges of:  (1) terroristic

threatening, a violation of Del. Code tit. 11, § 621; (2) theft under $1,500, a violation of Del.

Code tit. 11, § 841; (3) harassment, a violation of Del. Code tit. 11, § 1311; and (4) criminal

trespass first degree, a violation of Del. Code tit. 11, § 823. (*Id.*; D.I. 1 at 2, 14)

For her part, Plaintiff contends that Marchone's allegations were false.  For example, she

alleges that Marchone lied in reporting that Plaintiff had called him repeatedly that day.[8] (D.I. 1

---

[8]      Plaintiff notes in her Complaint that "[p]hone records proved there wasn't even one call made to [Marchone] by [P]laintiff on [July 21, 2011], or even the day before." (D.I. 1 at 3)  However, these phone records are not a part of the record in this case.

at 3)  She also denies trespassing into the residence, explaining that Bonnie Helder ("Helder"),

the owner of the residence, let her inside.  (*Id.*)  Plaintiff further denies removing Marchone's

license plate from his car, asserting that this would be an impossible task for her, as she had one

finger amputated and did not have feeling in her nine other fingers.  (*Id.* at 2-3)  Plaintiff suggests

that Marchone's purportedly false allegations were motivated by the fact that Plaintiff had

previously reported him for driving under the influence and driving without a license numerous

times.  (*Id.* at 2-3, 14)  She states that she and Helder allegedly witnessed Marchone taking

several oxycontin pills fifty minutes prior to making his report to Defendant Rowley.  (*Id.* at 3,

14)  Within an hour of making the report, Marchone himself was allegedly arrested for driving

without a license and driving under the influence.  (*Id.* at 3)

Thirty days after they were filed, the charges against Plaintiff were dropped.  (*Id.* at 3, 14)

Marchone was not arrested for filing the allegedly false report.  (*Id.* at 14)

Plaintiff also alleges that Defendant Rowley "slandered [P]laintiff numerous times to

several people on different occasions" and "blackballed [P]laintiff to many people, harassed her

and treated her in a discriminatory manner."  (D.I. 1 at 3, 18)  Defendant Rowley, for his part,

acknowledges only that he was aware of Plaintiff's habit of subleasing parts of rooms in

Summerlyn Condos, which resulted in numerous problems and police involvement, and that on

certain occasions he advised people there of Plaintiff's practice in this regard.  (D.I. 54 at A36, at

¶ 4)

### 6.  Defendant Warrington

Defendant Warrington is currently employed as a Corporal with the DSP, and has been

employed as a DSP Trooper and Corporal for the past twelve years.  (D.I. 54 at A60, at ¶ 1)  For

his entire career, he has been assigned to Troop 7. (*Id.*)

As was noted above, on March 6, 2011, a Delaware state court judge arraigned Plaintiff on criminal charges, issued a no contact order prohibiting her from any contact with the three male subjects, and gave Plaintiff permission to reside at Unit 305 (located approximately 100 feet away from the male subjects' residence at Unit 303). (*Id.* at A53) Defendants assert that Plaintiff violated that order the next day, March 7, 2011. Based on information relayed to him by investigating officers Corporal Blakeman and Sergeant Fuscellaro, Defendant Warrington prepared an arrest warrant in connection with this incident. (*Id.* at A60, at ¶¶ 4-5) Plaintiff was ultimately charged with disorderly conduct, a violation of Del. Code tit. 11, § 1301, and breach of release, violation of a no contact order, a violation of Del. Code tit. 11, § 2113. (*Id.* at ¶ 5)

The events relating to these new charges were as follows. On March 7, 2011, Plaintiff sent her friend Colletti to Unit 303 to retrieve certain items. (*Id.* at ¶ 4) Imperial asked Colletti what she was doing; Colletti replied that she was removing Plaintiff's property. (*Id.*; *id.* at A66) Imperial then approached the door and heard Plaintiff's voice outside. (*Id.* at A60, at ¶ 4; *id.* at A66) Plaintiff began yelling at Imperial, stating that she was allowed to remove items from the residence pursuant to her lawyer's instructions. (*Id.* at A60, at ¶ 4; *id.* at A66) Plaintiff was standing outside the entry door of Unit 303, and Imperial informed her that she was not supposed to be there. (*Id.* at A60, at ¶ 4) Plaintiff fled when the police arrived. (*Id.* at A60, at ¶ 4; *id.* at A66) She was eventually apprehended from inside of her motor home (in the series of events described above in connection with the allegations against Defendant Rowley relating to the March 7, 2011 arrest). (*Id.* at A34-A35, at ¶ 2; *id.* at A66)

Plaintiff alleges that at the time that he prepared the arrest warrant, Defendant Warrington

15

knew that the state judge who issued the no contact order had given Plaintiff permission to reside at Unit 305, even though it was just two doors down from the male subjects' residence. (D.I. 1 at 5) Plaintiff contends that she was standing in front of Unit 305, not Unit 303, at the time of the incident, and that Defendant Warrington and the investigating officers spoke to three witnesses who confirmed this fact. (*Id.*)

Defendant Warrington also investigated a complaint by Plaintiff on or about December 31, 2011 (the "December 31, 2011 incident"). Plaintiff was then complaining that Marchone had damaged her vehicle. (D.I. 54 at A61, at ¶ 6) Defendant Warrington interviewed Plaintiff and a witness, Abernathy; Abernathy said he had observed Marchone pour an unknown liquid across the roof of Plaintiff's vehicle. (*Id.* at A71) As a result of the investigation, Defendant Warrington obtained an arrest warrant for Marchone on the charge of attempted criminal mischief, a violation of Del. Code tit. 11, § 531. (*Id.* at A61, at ¶ 6; *id.* at A69-A73)

In addition to allegations regarding Defendant Warrington's participation in these two specific incidents, Plaintiff also alleges that he made "untrue, defamatory, unprofessional and slanderous" statements about her on several occasions over the years, including during the investigation of the December 31, 2011 incident. (D.I. 1 at 5) For his part, Defendant Warrington denies making any defamatory statements about Plaintiff during the December 31, 2011 investigation. (D.I. 54 at A61, at ¶ 6) He did advise her that the incident appeared to result from a landlord-tenant dispute. (*Id.*)

### 7.    Defendant O'Neil

Defendant O'Neil has been employed as a Trooper in the DSP for the past three years. (D.I. 54 at A32, at ¶ 1) Defendant O'Neil was dispatched by Troop 7 to the Summerlyn Condos

on September 16 or 17, 2011 at approximately 6:34 p.m., in response to an offensive touching complaint (the "September 16, 2011 incident").[9]  (D.I. 1 at 6; D.I. 54 at A32, at ¶ 2)  The incident involved a dispute between Plaintiff and a Nancy Regibal ("Regibal"), who was subleasing a sunroom in Unit 305 from Plaintiff.  (D.I. 1 at 6; D.I. 54 at A32, at ¶ 2)  Plaintiff alleges that Regibal pushed her, causing serious injury to Plaintiff's right knee.  (D.I. 1 at 6)  She claims that although Defendant O'Neil spoke with Regibal in regard to the incident, he refused to take any information from Plaintiff or a witness.  (*Id.*)

For his part, Defendant O'Neil avers that upon his arrival at Unit 305, he first spoke to Regibal to find out what had occurred.  Regibal told him that she had recently advised Plaintiff that she would soon be moving out of the sunroom.  (D.I. 54 at A32, at ¶ 2)  At approximately 4:00 p.m. on September 16, 2011, Plaintiff sent a text message to Regibal stating that she would be bringing someone to the Unit to show the sunroom.  (*Id.*)  Regibal was asleep at the time of the text message, and was awakened by a loud noise at 4:30 p.m.  (*Id.*)  Plaintiff was standing in the living room of the Unit at the entrance to the sunroom, and told Regibal to get up and get out so that Plaintiff could show the room.  (*Id.*)  Regibal responded that she was not going to leave because she was not feeling well.  (*Id.*)  Defendant O'Neil avers that Regibal stated that Plaintiff then became irate, called Regibal a "f—ing bitch[,]" and walked toward Regibal aggressively, cornering her.  (*Id.*)  According to Defendant O'Neil, Regibal stated that she and Plaintiff each pushed each other (Regibal in self-defense), and that no one was injured.  (*Id.*)

Defendant O'Neil asserts that he also spoke to Plaintiff, by phone, and that Plaintiff stated

---

[9]     Plaintiff lists the date of the incident as September 16, 2011, while Defendant O'Neil lists it as September 17, 2011.  (D.I. 1 at 6; D.I. 54 at A32, at ¶ 2)  The exact date is not material, and for ease of reference, the Court will use the first of the two dates provided.

that nothing happened and that she should be pressing charges against Regibal. (*Id.* at A33, at ¶ 2) Plaintiff further stated that Regibal was leaving the Unit and there was no reason for Regibal to be there. (*Id.*) Defendant O'Neil asserts that Plaintiff then became irate, claiming that she should not be talking to any state troopers and that the "State Police" can "f— off." (*Id.*) Defendant O'Neil alleges that Plaintiff then accused him of "being discriminative towards her." (*Id.*)

Defendant O'Neil next contacted Regibal again, who stated that she wanted the incident documented but that she would be moving out of the Unit in the near future. (*Id.* at ¶ 3) No charges were filed, (D.I. 1 at 10), and Defendant O'Neil had no further involvement in the incident, (D.I. 54 at A32, at ¶ 3).

Aside from his role in this incident, Plaintiff also alleges that Defendant O'Neil "slandered and blackballed [P]laintiff to many people, harassed her and treated her in a discriminatory manner." (D.I. 1 at 18)

### 8.   Defendant Whaley

Defendant Whaley was employed in the DSP, including as a Sergeant, from 1988 until his retirement in 2011. (D.I. 54 at A84, at ¶ 1; *see also* D.I. 1 at 2) Plaintiff alleges that on "several" unidentified dates, she approached Defendant Whaley to seek help regarding improper arrests made by (and generally, regarding the conduct of) his subordinates. (D.I. 1 at 2) According to Plaintiff, Defendant Whaley "did nothing to assist [P]laintiff, and seemingly conspired and condoned their actions[.]" (*Id.*) Plaintiff also asserts that Defendant Whaley "discriminated" against her several times when she sought his help. (*Id.*)

For his part, Defendant Whaley recalls only one contact with Plaintiff on an unspecified

18

date. (D.I. 54 at A84, at ¶ 2)  While Defendant Whaley was a Desk Sergeant at Troop 5, he took

a complaint from Plaintiff that he passed on to another Corporal, who ultimately routed the

complaint to Troop 7.  (*Id.*)  Defendant Whaley was assigned to Troop 7 from 1991-1995 and

from 2010-2011, where he worked in the Fatal Investigation Unit and DARE.  (*Id.* at ¶ 3)

Defendant Whaley does not recall any contact or dealings with Plaintiff while assigned to Troop

7.  (*Id.*)

### 9.    Defendant Barnett

Defendant Barnett has been employed in the DSP since 1993, and is currently a Sergeant

at Troop 7.  (D.I. 54 at A82, at ¶ 1)  Defendant Barnett and Plaintiff have had numerous contacts

in Defendant Barnett's capacity as a supervisor, including during frequent telephone calls from

Plaintiff to Troop 7 in which she requested that DSP take certain actions.  (*Id.* at ¶ 2; D.I. 1 at 4)

Plaintiff alleges that on several occasions between 2008 and 2011, Defendant Barnett

refused to help Plaintiff when she complained about the improper conduct of his subordinates;

she asserts that he harassed her, ordered her to leave Troop 7 and threatened to arrest her when

she asked to speak to his supervisor.  (D.I. 1 at 4)  The one specific example of such conduct that

Plaintiff cites to occurred when Plaintiff allegedly requested Defendant Barnett's help after

Defendant O'Neil refused to file charges in connection with the September 16, 2011 incident

between Plaintiff and Regibal.  (*Id.* at 6)  According to Plaintiff, Defendant Barnett stated that it

was a civil matter and he was not getting involved, and hung up the phone when Plaintiff asked

to speak to Defendant O'Neil's supervisor.  (*Id.*)  When Plaintiff later went to Troop 7, she

alleges that Defendant Barnett threatened to arrest her and insisted that she leave without

speaking to a supervisor.  (*Id.*)

Defendant Barnett acknowledges that he refused to speak with Plaintiff when she acted in a belligerent and rude manner during certain phone calls. (D.I. 54 at A82, at ¶ 3) He also advised Plaintiff that she could be arrested for placing multiple calls to the 911 center. (*Id.* at ¶ 4) In addition, Defendant Barnett admits that he asked Plaintiff to leave Troop 7 on certain occasions, but alleges that he did so because Plaintiff was acting in a disorderly manner, yelling and berating DSP members. (*Id.* at ¶ 3) However, Defendant Barnett denies ever advising Plaintiff that she could not speak to any supervisor, and claims that he "did not at any time ever advise her not to file criminal charges if warranted by the particular facts." (*Id.* at ¶ 5)

### 10.   Defendant Hardy

Defendant Hardy was employed in the DSP from 1988 until his retirement in 2009. (D.I. 54 at A85, at ¶ 1) As a Sergeant at DSP, Defendant Hardy was assigned to Troop 7 and had several interactions with Plaintiff. (*Id.* at ¶ 2)

Plaintiff alleges that in 1998, Defendant Hardy falsely arrested her on a charge of offensive touching at Beebe Heathcare, where she was receiving stitches for injuries she sustained as a victim of domestic violence. (D.I. 1 at 6) Plaintiff was later found not guilty of the charge after a trial. (*Id.*)

Plaintiff also asserts that over the next decade until his retirement, Defendant Hardy retaliated against her, hung up the phone on her, harassed her, filed false charges against her, failed to reprimand his subordinates when they mistreated her, and conspired and participated in their harassment of Plaintiff. (*Id.*) Plaintiff claims that Defendant Hardy allowed officers to verbally abuse Plaintiff while she was in the police station waiting for the judge to appear on video. (*Id.*) Furthermore, Plaintiff alleges that on one occasion, an unidentified officer

20

intentionally hit her arm while she was handcuffed to a bench, and that Defendant Hardy laughed when she reported the incident to him. (*Id.* at 6-7)

In contrast to Plaintiff's allegations, Defendant Hardy denies ever harassing or retaliating against Plaintiff, and claims to have no knowledge of any other officers engaging in unfair treatment of Plaintiff. (D.I. 54 at A85, at ¶ 2) Defendant Hardy alleges that Plaintiff frequently called Troop 7 demanding service and answers, and frequently appeared there in person, engaging in disorderly conduct. (*Id.*) Defendant Hardy has had no contact or dealings with Plaintiff since 2009. (*Id.* at ¶ 1)

### 11. Defendant Dixon

At the time that Plaintiff filed her Complaint, Defendant Dixon was the supervisor for Troop 7. (D.I. 1 at 7) In 2011, Defendant Dixon met with Plaintiff several times to discuss the conduct of Troop 7. (*Id.* at 7, 12) According to Plaintiff, he was polite and treated Plaintiff with respect and professionalism. (*Id.*) At some point, according to Plaintiff, Defendant Dixon sent an e-mail to all Troop 7 police officers informing them to "treat all new complaints fairly without using past experience, judgments or prejudices[.]" (*Id.* at 7)

However, Plaintiff alleges that Defendant Dixon's subordinates continued to mistreat Plaintiff by filing false and unsubstantiated charges, failing to properly investigate complaints, acting unprofessionally, failing to show up for court after being subpoenaed, slandering Plaintiff, and by engaging in abuse of power, harassment and retaliation. (*Id.*) Plaintiff cited to the "unprofessional[]" behavior of Defendant O'Neil regarding the September 16, 2011 incident and of Defendant Warrington as to the December 31, 2011 incident as examples of such mistreatment. (*Id.*) Plaintiff included Defendant Dixon as a Defendant in this action because

21

although he "act[ed] in a manner which was proper, reasonable and lawful[,]" his "actions did

not improve the situation." (*Id.* at 9)

### 12.    Delaware State Police Troop # 7

Plaintiff's Complaint also contains allegations against Troop 7 regarding a variety of

conduct spanning the time period from 1998 through January 23, 2012. (D.I. 1)

First, Plaintiff includes allegations regarding conduct committed by "Troop 7" generally,

which purportedly occurred repeatedly during this time period:

- Troop 7 would alert various newspapers to Plaintiff's arrests but would fail to inform these publications when charges were resolved in Plaintiff's favor. (D.I. 1 at 15-16)

- Troop 7 failed to respond to discovery requests numerous times in last decade. (*Id.* at 16)

- Troop 7 harassed Plaintiff by repeatedly pulling her over without probable cause over the years. (*Id.* at 17)

- Troop 7 repeatedly failed to respond to Plaintiff's 911 calls over the years. (*Id.*)

- Troop 7 officers have called her various names over the years and have made negative remarks to Plaintiff regarding her disability, Italian heritage, and gender. (*Id.* at 19)

- Troop 7 officers have "discriminated against Plaintiff due to her religious beliefs in varying ways." (*Id.* at 20) They have, for example, allegedly mocked and criticized her religious beliefs, telling her she could not be a Christian because she did not act like one and that she will not go to heaven. (*Id.*)

- When Troop 7 filed charges against Plaintiff, they "consistently sent 3 or 4 police cars to actively look for her at different locations within hours." (*Id.* at 11) This occurred, among other times, on July 23, 2011 and July 24, 2011, when several officers went to three condominiums in the Summerlyn Condos complex looking for Plaintiff. (*Id.*)

Second, Plaintiff describes isolated incidents that purportedly further demonstrate Troop

7's continued mistreatment and harassment of her. In doing so, she either does not name specific

officers associated with such conduct, or references officers that she has not sued in this action:

- Troop 7 filed several trespass charges against Plaintiff in 1998, as well as other trespass charges ten years later regarding a home Plaintiff owned in Rehoboth Beach, Delaware, all of which were dropped. (*Id.* at 9)

- On June 3, 1998, Plaintiff truthfully reported that someone had struck and killed her dog with a car. (*Id.* at 14) On June 5, 1998, an Officer Pezuto, now no longer with Troop 7, walked into Plaintiff's residence and arrested her on charges of filing a false police report. (*Id.*) The charges were ultimately dropped. (*Id.*)

- On April 11, 2000, Plaintiff went to Troop 7 for help, but the officers refused. (*Id.* at 15) While inside the lobby of Troop 7, Plaintiff called Internal Affairs to complain. (*Id.*) A Lieutenant Hagen ordered Officer Rick Deskis to arrest Plaintiff for loitering. (*Id.*) While Officer Deskis was processing Plaintiff, he allegedly advised her to stop going to Internal Affairs and to be quiet because "they hate you and want to arrest you for anything." (*Id.*) The charge was eventually dropped. (*Id.*)

- On November 14, 2008, Troop 7 filed unsubstantiated charges against Plaintiff in connection with a civil dispute that had occurred between Plaintiff and a family. Troop 7 did not properly investigate the complaint prior to filing charges, and the charges were dropped when evidence revealed that Plaintiff was hospitalized on the day of the purported disagreement. (*Id.* at 9, 15)

- Plaintiff describes police misconduct in connection with disputes that she had with an individual named Jeff Taylor ("Taylor"). It appears that these incidents occurred in approximately 2008. (*See* D.I. 47 at 8) Plaintiff alleges that Troop 7 arrested her for theft after she brought a gym bag to Troop 7 that had been left by Taylor in a rental property she managed. (D.I. 1 at 16) Plaintiff asserts that Troop 7 destroyed a video that documented her bringing in the gym bag. (*Id.*; *see also* D.I. 47 at 5) Meanwhile, although Plaintiff had contacted Troop 7 for help several times because Taylor had trespassed on the rental property, Troop 7 refused to provide assistance or file charges against Taylor. (D.I. 1 at 16; *see also* D.I. 47 at 7-8) Troop 7 officers also refused to provide assistance in response to Plaintiff's complaints that Taylor was trying to extort money from her in return for his agreement to not appear for a pending court case. (D.I. 1 at 16; D.I. 47 at 8)

- Plaintiff describes two occasions, on unidentified dates, on which representatives of Troop 7 had a detrimental affect on Plaintiff's employment. One occasion related to the fact that Plaintiff had been hired as a teacher at a local school. (D.I.

1 at 16)  While at an open house, Plaintiff encountered an off-duty Troop 7 police officer; soon after, Plaintiff overheard the officer talking about her with the school's director.  (*Id.*)  Two days later, the director informed Plaintiff that the job was no longer available, and Plaintiff alleges that this was a result of derogatory information provided by the Troop 7 officer.  (*Id.*)  On another occasion, an individual who had previously harassed Plaintiff "lied to the police about an incident when [Plaintiff] was not working."  (*Id.* at 20)  The police came to Plaintiff's workplace and harassed her.  (*Id.*)  Although no charges were filed, Plaintiff lost her job.  (*Id.*)

- Plaintiff alleges that beginning in 2011, certain false charges filed against her by Troop 7 had a negative effect on her volunteer work with her church.  (*Id.* at 19-20)  The new church pastor asked Plaintiff not to attend a women's conference in October 2011, and requested that she not chaperone a youth overnight trip in 2012 due to "'reservations he had concerning her and the police[.]'"  (*Id.* at 20)

- Plaintiff accuses non-Defendant Corporal Robertson of slander, harassment, and treating her in a discriminatory manner, although she does not specify any dates on which such conduct occurred, nor provide more specific details about such conduct.  (*Id.* at 18)

Third, Plaintiff accuses "several Troop 7 State Police officers and other people in Sussex County" as giving preferential treatment to prominent county residents and members of the "'good old boys'" club, and contrasts this with the treatment she received from Troop 7 officers. (*Id.* at 10)  Plaintiff provides examples involving two individuals:  Vance Phillips ("Phillips") and Marchone:

- With regard to Phillips, Plaintiff alleges that on an unidentified date, Phillips assaulted a Sussex County Sheriff, hitting the Sheriff in the eye with a book and kicking him in the groin.  (*Id.*)  Troop 7 assertedly investigated the incident for three months but ultimately did not bring charges against Phillips, citing a lack of evidence of physical injury.  (*Id.*)  Plaintiff contrasts this with the September 16, 2011 incident, in which she says Defendant O'Neil failed to file charges against Regibal on her behalf, even though Plaintiff had been physically injured by Regibal.  (*Id.*)

- As for Marchone, Plaintiff cites to a few different incidents purportedly demonstrating Troop 7's preferential treatment of him (as compared to Plaintiff).  Plaintiff alleges that Marchone has been arrested a number of times for driving

under the influence and driving without a license in Delaware and in other states. (*Id.*) She has reported him to Troop 7 for driving without a license at least six times, but asserts that Troop 7 failed to respond to the majority of those reports because they "had more important complaints to handle." (*Id.*) Additionally, Plaintiff alleges that in January 2012, there were two active warrants for Marchone, but police did not attempt to immediately execute the warrants (as they did when Plaintiff had an outstanding warrant against her). (*Id.*) Finally, Plaintiff contends that Marchone lied to the police in accusing Plaintiff of theft in connection with the charges filed against her regarding the July 21, 2011 incident, but that Troop 7 failed to charge Marchone with filing a false report even after it was proven that he had lied. (*Id.* at 14)

**B.    Procedural History**[10]

On January 23, 2012, Plaintiff, acting *pro se*, filed this action pursuant to Section 1983 against the Individual Defendants, in their individual and official capacities, and against Troop 7. (D.I. 1)  On May 3, 2012, this action was referred to the Court by Judge Gregory M. Sleet to conduct all proceedings related to discovery disputes, alternate dispute resolution, and dispositive and nondispositive motions, up to the pretrial conference. (D.I. 19)

The Court issued a Scheduling Order on June 7, 2012, which set a December 31, 2012 deadline for completion of fact discovery. (D.I. 22 at ¶ 3(a))  Approximately six weeks before the discovery period was set to expire, Defendants requested a teleconference with the Court to address Plaintiff's failure to respond to their discovery requests. (D.I. 29)  For her part, Plaintiff explained that health issues had interfered with her ability to do so, and requested that the fact discovery deadline be postponed until after March 13, 2013. (D.I. 38)  Following a teleconference with the parties on January 3, 2013, the Court extended that deadline until

---

[10]    Because Plaintiff has indicated that she requires missing discovery in order to adequately respond to Defendants' Motion, (D.I. 65 at ¶¶ 3, 5), which the Court will address *infra*, the Court also recounts herein the pertinent details with respect to the discovery-related history between the parties in this action.

February 15, 2013.[11]  (D.I. 41 at ¶ 1)  The Court also extended the deadline for the filing of case

dispositive motions from February 28, 2013 to April 12, 2013.  (D.I. 22 at ¶ 9; D.I. 41 at ¶ 5)

On February 21, 2013, Plaintiff filed a motion to compel complete responses to

interrogatory requests, pursuant to Fed. R. Civ. P. 37(a).[12]  (D.I. 48)  The Court granted

Plaintiff's motion to compel in part, ordering Defendants to provide Plaintiff with full and

complete answers to two sub-parts of an Interrogatory relating to Defendant Layfield. *Paoli v.*

*Stetser*, Civil Action No. 12-66-GMS-CJB, 2013 WL 2154393, at *8-10 (D. Del. May 16,

2013).  However, the Court declined to analyze the adequacy of Defendants' responses to

Plaintiff's remaining discovery requests, in light of the fact that Plaintiff had failed to articulate

with any specificity what additional interrogatory responses she was challenging. *Id.* at *7-8 &

*10 n.9.  In doing so, the Court acknowledged that Defendants had "provided narrative answers

to many of Plaintiff's interrogatories, and produced approximately 270 pages of responsive

documents along with multimedia materials in response to Plaintiff's requests for production of

documents." *Id.* at *10 n.9 (citations omitted).

---

[11]      Within a later-filed motion seeking to amend her Complaint (the "motion to
amend"), Plaintiff made a subsequent request to further extend the discovery deadline "until after
April 15[.]"  (D.I. 47 at 18)  The Court denied that request, finding that Plaintiff had failed to
establish a sufficient showing of good cause under Fed. R. Civ. P. 16(b) to warrant any further
extension. *Paoli v. Stetser*, Civil Action No. 12-66-GMS-CJB, 2013 WL 2154393, at *7 n.5 (D.
Del. May 16, 2013).

[12]      On the same date, Plaintiff also filed the motion to amend referred to above.  In
that motion, Plaintiff sought to: (1) add claims relating to certain arrests that occurred after the
commencement of the instant action; and (2) name the four police officers involved in those
arrests, along with two other officers allegedly involved in Plaintiff's existing claims, as
additional defendants to this action. (D.I. 47); *see also Paoli*, 2013 WL 2154393, at *4.  The
Court recommended that Plaintiff's motion to amend be denied for failure to demonstrate good
cause sufficient to allow the amendment. *Paoli*, 2013 WL 2154393, at *4-6.  The District Court
later adopted that recommendation.  (D.I. 62)

On April 5, 2013, Defendants filed the instant Motion. (D.I. 52)  On April 26, 2013—four days after her responsive brief was due to be filed—Plaintiff sought an extension of time within which to oppose the Motion. (D.I. 55)  In addition to citing to health issues that would affect her ability to timely respond, Plaintiff explained that she would be moving in the near future, and would need time to locate and unpack documentary evidence necessary to support a responsive brief. (*Id.*)  Plaintiff also included in her request a list of eleven numbered "facts in this case which are disputed[,]" and noted that "[t]here are approximately 19 other disputed facts" that she could "not list [] with specificity and in detail at this time because most of [her] papers, documents and evidence items [are] boxed up." (*Id.* at 1-2)  On May 21, 2013, the Court granted Plaintiff's request, setting Plaintiff's deadline to file a responsive brief in opposition to the Motion ("responsive brief") as June 17, 2013. (D.I. 59)

Plaintiff nevertheless did not file her responsive brief until August 8, 2013. She accompanied the brief with a separate letter indicating the reasons for the brief's untimeliness, which related to: (1) her own personal health issues; (2) the death of a close family member; (3) and the fact that she had moved in the interval, but had not provided this Court with her new address (such that she did not timely receive the Court's prior Order setting the June 17, 2013 deadline for submission of her responsive brief). (D.I. 65, 66)  Defendants filed a reply brief on August 12, 2013. (D.I. 69)[13]  Plaintiff thereafter filed a sur-reply brief on September 19, 2013,

---

[13]     In Defendants' reply brief, they ask the Court to strike Plaintiff's responsive brief on the grounds that it was untimely filed. (D.I. 69 at ¶ 1)  There is no doubt that the responsive brief was untimely, and at least one portion of Plaintiff's excuse for that untimeliness (relating to her failure to update the Court with her new address) is not a good one. *Cf. Krieger v. Russell*, 286 F.R.D. 261, 263 (D. Del. 2012) (dismissing plaintiff's suit where he failed to respond to defendant's filing and noting that "[i]t is plaintiff's responsibility to provide the court his current address"); *Hall v. Holman*, Civil Action No. 04-1328-GMS, 2007 WL 2049776, at *2 (D. Del.

without first obtaining leave of Court pursuant to Local Rule 7.1.2(b). (D.I. 71)[14] The Motion is now ripe for decision.

## II.   STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party

---

July 12, 2007) (dismissing plaintiff's suit where plaintiff failed to timely respond to court orders and noting that "[i]t is [plaintiff's] responsibility to keep the court apprised of his whereabouts" and "[plaintiff's] status as a *pro se* litigant does not alleviate his responsibility to keep the court apprised of his current address [and to] comply with court [o]rders"). However, the Court has concern about an outcome that would leave it unable to consider *any* substantive response to the Motion that has been filed by Plaintiff, especially at a stage where Plaintiff's ability to further pursue those claims hangs in the balance. In light of that concern, and in light of the health-related and personal reasons Plaintiff cites for her failure to timely file the responsive brief, the Court will excuse its untimeliness and consider the contents of that brief.

[14]     In the sur-reply brief, Plaintiff reiterated the health and personal reasons that had affected her ability to timely respond to the Motion and continued to advance her argument that the Motion should be denied. (*Id.*) Unlike a responsive brief, however, a non-moving party does not have a right under the Court's Local Rules to file a sur-reply brief, and the ability to do so is limited only to those circumstances where the sur-reply brief responds to "new evidence, facts, or arguments" improperly raised for the first time in the moving party's reply brief. *St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013). Plaintiff does not attempt to explain how the filing of her sur-reply brief is justified pursuant to this standard, and the Court discerns no basis for such a claim. Therefore, the Court will not consider the contents of the sur-reply brief.

is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

During this process, the Court will "draw all reasonable inferences in favor of the nonmoving

party, and it may not make credibility determinations or weigh the evidence." *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must

"do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d

Cir. 2005) (party opposing summary judgment "must present more than just bare assertions,

conclusory allegations or suspicions to show the existence of a genuine issue") (internal

quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter

the outcome are "material," and a factual dispute is genuine only where "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at

249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively,

is—genuinely disputed must support the assertion either by citing to "particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials"; or by "showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.   DISCUSSION

In Plaintiff's responsive brief, she argues, *inter alia*, that summary judgment is premature as "[a]ll of the relevant facts necessary for [her] to defend and file a complete and accurate response to the summary judgment request have not been given to [her] yet."  (D.I. 65 at ¶ 3) The Court construes this as a request for discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, and before turning to the merits of Plaintiff's claims, the Court will first consider that request.

### A.   Plaintiff's Request for Discovery

Rule 56 governs summary judgment, and part (d) of the Rule, titled "When Facts Are Unavailable to the Nonmovant[,]" states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  A Rule 56(d) motion is essentially "the proper recourse of a party faced with a motion for summary judgment who believes that additional discovery is necessary before he can adequately respond to that motion." *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 309 (3d Cir. 2011); *Square Ring, Inc. v. Doe-1*, Civil Action No. 09-563 (GMS), 2014 WL 1116960, at *3 (D. Del. Mar. 18, 2014).  The Third Circuit has construed Rule 56(d) (and its predecessor, Rule 56(f)) as requiring that "a party seeking further discovery in response to a summary judgment motion [must] submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has

not previously been obtained." *Dowling v. City of Phila.*, 855 F.2d 136, 139-40 (3d Cir. 1988); *see also Pa., Dept. of Pub. Welfare v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012).

District courts have discretion in resolving Rule 56(d) motions. *Superior Offshore Int'l, Inc. v. Bristow Grp.*, 490 F. App'x 492, 501 (3d Cir. 2012); *Square Ring, Inc.*, 2014 WL 1116960, at *3. "Vague or general statements of what a party hopes to gain through a delay for discovery under . . . Rule 56(d) [] are insufficient." *Atl. Deli & Grocery v. United States*, Civil No. 10-4363 (JBS/AMD), 2011 WL 2038758, at *3 (D.N.J. May 23, 2011) (citing *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1987)). And in situations where relevant material was not timely pursued, the party seeking additional discovery must sufficiently explain the lack of diligence. *Lunderstadt v. Colafella*, 885 F.2d 66, 71-72 (3d Cir. 1989) (citations omitted).

Here, Plaintiff did not file an affidavit in support of her request for discovery, "'and therefore, as a procedural matter alone, [she] has failed to comply' with Rule 56(d)." *McCluskey v. Vincent*, 505 F. App'x 199, 205 (3d Cir. 2012) (quoting *Dowling*, 855 F.2d at 140). But even if the Court could look past that procedural failure, when assessing the remainder of what the Third Circuit requires in order to support a valid Rule 56(d) motion, it is clear that Plaintiff's request should be denied for many other reasons.

First, Plaintiff largely fails to identify "what particular information is sought." In her request, Plaintiff states that "[D]efendant(s) didn't provide all of the discovery or the information granted by the [Court] in the motion to compel." (D.I. 65 at ¶ 3) But though she then asserts that "[s]ome of the missing discovery includes videotapes, officer statements and 911 calls" Plaintiff

never identifies what particular videotapes, statements or 911 calls she is referring to here. (*Id.*)[15] Nor is it otherwise obvious to which materials Plaintiff is referring, particularly in light of the many and varied incidents that Plaintiff has had over the years involving Troop 7 and its officers. Indeed, the only "missing" discovery material that Plaintiff specifically identifies in her responsive brief is "the additional information pertaining to Corporal Layfield that [the Court] granted in [Plaintiff's] motion to compel." (*Id.* at ¶ 8; *see also id.* at ¶ 5 ("[t]here are still . . . facts yet to be answered by [D]efendants pertaining to Corporal Layfield and the eight part interrogatory")) This is a reference to the supplemental responses to Plaintiff's Interrogatories 3(a) and 3(f) regarding Defendant Layfield that the Court had previously ordered Defendants to provide to Plaintiff. *See Paoli*, 2013 WL 2154393, at *10. But to the extent that Plaintiff's request for discovery seeks materials beyond these interrogatory responses, the request is far too vague to satisfy Rule 56(d)'s requirements.

Second, even as to the Defendant Layfield interrogatory responses, Plaintiff is silent as to how "if uncovered, [they] would preclude summary judgment." Plaintiff simply never explains *how* these responses, if received, would be expected to demonstrate that a genuine issue of material fact exists regarding her claims relating to Defendant Layfield or any other Defendant.

Third, even if Plaintiff had provided that kind of an explanation, she has not sufficiently

---

[15]    At one point in her responsive brief, Plaintiff does specifically identify a 911 tape, but one that was actually in her possession—not one that she asserts Defendants should have and failed to produce pursuant to one of her discovery requests in this matter. (D.I. 65 at ¶ 5) Moreover, that tape was recorded on October 1, 2012, and relates to an arrest that occurred after the date of the filing of the Complaint in the instant case. (D.I. 69 at ¶ 4) For that reason, the tape would not be relevant to the claims presently before the Court. *See Paoli*, 2013 WL 2154393, at *4-5 (denying Plaintiff's request to amend her Complaint to add facts and claims relating to arrests that occurred after the commencement of this action, including the October 1, 2012 arrest).

explained "why [the interrogatory responses] ha[ve] not previously been obtained." That is, assuming that Plaintiff never in fact received the interrogatory responses at issue, she does not articulate why this was not the result of a lack of diligence on her part. Indeed, the docket indicates that on May 28, 2013—twelve days after the Court issued its decision on the motion to compel—Defendants properly served the supplemental interrogatory responses by mailing them to a Lake Magnolia Drive address in New Port Richey, Florida—the most recent mailing address that Plaintiff had then provided to the Court. (D.I. 34; D.I. 60 at 3; D.I. 69 at ¶ 5) Subsequent to that mailing, the docket indicates that Plaintiff provided the Court with two new mailing addresses in New Port Richey. (*See, e.g.*, D.I. 65 at 5) And so it may be that at the time that the responses were mailed to the Lake Magnolia Drive address, Plaintiff's mailing address had changed. But even if that were so, as Plaintiff herself acknowledges, it was her responsibility to keep the Court and Defendants' counsel appraised of any change to her mailing address. (*See* D.I. 66 at 1); *cf. Krieger v. Russell*, 286 F.R.D. 261, 263 (D. Del. 2012); *Hall v. Holman*, Civil Action No. 04-1328-GMS, 2007 WL 2049776, at *2 (D. Del. July 12, 2007). Moreover, if Plaintiff did not in fact timely receive those interrogatory responses, she should have raised that issue with the Court by way of the Court's discovery dispute procedures, which are incorporated into the governing Scheduling Order. (D.I. 22 at ¶ 3(g)) Therefore, the fact that Plaintiff does not possess "missing" interrogatory responses regarding Defendant Layfield appears to be attributable to Plaintiff's own neglect. *Cf. Square Ring, Inc.*, 2014 WL 1116960, at *3 (denying plaintiff's Rule 56(d) motion based on plaintiff's "silence about its discovery concerns and lack of diligence in seeking additional discovery before the end of fact discovery").

For all of the above reasons, Plaintiff has failed to meet her burden with regard to her

Rule 56(d) motion, and her request for discovery is therefore denied. *See McCluskey*, 505 F.

App'x at 205 (finding no abuse of discretion in district court's denial of plaintiff's Rule 56(d)

motion, where plaintiff's request was "ambiguous at best" and did not include an explanation as

to why he had failed to obtain the discovery he sought); *McKenna v. Healthease, Inc.*, Civil

Action No. 10-3940, 2013 WL 1702639, at *5 (E.D. Pa. Apr. 19, 2013) (denying plaintiff's

request for additional discovery where she failed "to include an affidavit or declaration

specifying what particular discovery she seeks and how such discovery would preclude summary

judgment").[16]

### B.    Defendants' Motion for Summary Judgment

The Court now turns to the merits of Defendants' Motion. All Defendants have moved

for summary judgment against Plaintiff.

As previously noted, Plaintiff's Complaint is lengthy and haphazardly organized; it does

not contain Counts and does not always clearly identify the type of claim(s) Plaintiff intends to

assert against particular Defendants. Plaintiff's responsive brief is no more helpful in that regard.

Nevertheless, the Court has an obligation to liberally construe a civil rights complaint brought by

a *pro se* plaintiff and to apply the relevant law, "irrespective of whether a pro se litigant has

mentioned it by name." *Holley v. Dep't of Veterans Affairs*, 165 F.3d 244, 247-48 (3d Cir.

1999); *see also Adams v. Selhorst*, 779 F. Supp. 2d 378, 383 n.2 (D. Del. 2011), *aff'd*, 449 F.

---

[16]    The Court notes, however, that in accordance with Local Rule 5.4 (which requires that, in *pro se* matters, all requests for discovery and answers and responses thereto be filed with the Court), at least the interrogatory responses regarding Defendant Layfield have been made a part of the record in the case. (D.I. 60) Thus, the Court has reviewed them and taken them into account prior to deciding Defendants' Motion. The Court will not, however, delay its decision on the Motion to allow for these requests to be re-served upon Plaintiff.

App'x 198 (3d Cir. 2011).

Plaintiff brings suit against Defendants in connection with numerous arrests and encounters dating back to 1998. (D.I. 1) Plaintiff's Complaint states that Defendants are liable pursuant to Section 1983 for violations of Plaintiff's constitutional rights; and she appears to intend to assert Section 1983 claims based on false arrest, malicious prosecution, illegal search and seizure, supervisory liability, conspiracy, abuse of power, retaliation and violations of her right to equal protection. (*Id.*) Plaintiff also appears to intend to assert state law claims for abuse of process, negligence and slander, and she vaguely references claims for discrimination, harassment and "whistleblower violations." (*Id.*) Plaintiff seeks monetary and injunctive relief for Defendants' alleged misconduct. (*Id.* at 21)

### 1.    Legal Standard for Section 1983 Claims

Section 1983 provides, in relevant part: "Every person who, under color [of law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." 42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead "merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003). "To state a claim under [Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

35

2.    Analysis[17]

a.    **Defendant Layfield**

(1)    **False arrest**

Plaintiff appears to assert a Section 1983 claim for false arrest against Defendant Layfield

in connection with the March 24, 2007 incident. (D.I. 1 at 3-4, 9 (asserting that Defendant

Layfield arrested Plaintiff as a means of "'payback'" for Plaintiff filing a complaint against

another officer)) "To state a claim for false arrest under the Fourth Amendment, a plaintiff must

establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause."

*James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012); *Small v. Herrera*, Civ. No. 13-

1615-SLR, 2014 WL 1247151, at *2 (D. Del. Mar. 25, 2014). Defendant Layfield argues, *inter*

*alia*, that this claim is barred by the applicable statute of limitations. (D.I. 53 at 8-9)[18]

Section 1983 itself contains no statute of limitations. *Blow v. Paterson Police Dep't*,

Civil Action No. 11-2128 (SRC), 2012 WL 368206, at *5 (D.N.J. Feb. 3, 2012). The Supreme

Court of the United States has accordingly held that Section 1983 claims are subject to the

applicable state statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261,

276 (1985), *superseded by statute on other grounds*, *as stated in Jones v. R.R. Donnelley & Sons*

*Co.*, 541 U.S. 369, 377-78 (2004); *see also Poole v. Marks*, 441 F. App'x 854, 857 (3d Cir.

---

[17]    Again, for ease of reference, the Court will largely organize its analysis on a
Defendant-by-Defendant basis. However, where Plaintiff asserts similar claims in similarly
vague fashion against multiple Defendants, the Court will address those claims together later in
this Report and Recommendation.

[18]    Generally, a defendant must raise statute of limitations as an affirmative defense
in responding to a complaint, pursuant to Federal Rule of Civil Procedure 8(c). *Paskins v.*
*Brown*, Civ. No. 13-563-SLR, 2013 WL 3341189, at *3 (D. Del. July 1, 2013). Defendants did
so here. (D.I. 18 at 3)

2011); *Turner v. Corr. Med. Servs.*, 479 F. Supp. 2d 453, 462 (D. Del. 2007).  In Delaware,

therefore, Section 1983 claims are subject to a two-year limitations period. Del. Code tit. 10, §

8119; *McDowell v. Del. State Police*, 88 F.3d 188, 190 (3d Cir. 1996); *Turner*, 479 F. Supp. 2d at

462.  "Claims not filed within the two-year statute of limitations period are time-barred and must

be dismissed." *Turner*, 479 F. Supp. 2d at 462.

 Although state law governs when the claim must be brought, federal law governs when a

cause of action accrues. *Wallace v. Kato*, 549 U.S. 384, 387-88 (2007).  Accrual occurs when the

plaintiff has a "complete and present cause of action . . . that is, when the plaintiff can file suit

and obtain relief." *Id.* at 388 (internal quotation marks and citations omitted).  "When false

arrest is the basis of the [Section] 1983 action, the statute of limitations normally begins to run at

the time of arrest." *Ginter v. Skahill*, 298 F. App'x 161, 163 (3d Cir. 2008); *see also Singleton v.

DA Phila.*, 411 F. App'x 470, 472 (3d Cir. 2011); *Cannon v. City of Wilmington Police Dep't*,

Civil Action No. 11-136 GMS, 2012 WL 4482767, at *3 (D. Del. Sept. 27, 2012).

 Here, Defendant Layfield obtained a warrant for Plaintiff's arrest on the charge of

harassment on March 24, 2007.  (D.I. 54 at A24, at ¶¶ 2-3; *id.* at A27-A31)  Plaintiff was arrested

on the warrant two days later, on March 26, 2007.  (*Id.* at A31)  Plaintiff did not file her

complaint in this action until January 23, 2012—nearly five years later.  Therefore, Plaintiff's

Section 1983 claim against Defendant Layfield for false arrest is barred by the statute of

limitations, regardless of whether the claim would otherwise be actionable. *See, e.g., Ginter*, 298

F. App'x at 163 (affirming district court's grant of summary judgment where plaintiff's Section

1983 false arrest claims were "time barred because more than two years elapsed between her

arrest date, December 12, 2001, and the date the complaint was filed, June 4, 2004"); *Walker v.*

*Fisher*, No. Civ.A. 01-578, 2005 WL 147484, at *2 (E.D. Pa. Jan. 21, 2005) (concluding that

plaintiff's Section 1983 false arrest claim was barred by statute of limitations where he filed

complaint two years and eleven months after his cause of action accrued).

### (2)    Malicious prosecution

The Court construes Plaintiff's Complaint as additionally asserting a malicious

prosecution claim against Defendant Layfield, although Plaintiff does not explicitly identify such

a claim. (D.I. 1 at 3 (Plaintiff asserting that Defendant Layfield "filed false charges against" her

as to the March 24, 2007 incident)) "To prevail on a malicious prosecution claim under Section

1983, a plaintiff must show that:  (1) the defendants initiated a criminal proceeding; (2) the

criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without

probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the

plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept

of seizure as a consequence of a legal proceeding." *McKenna v. City of Phila.*, 582 F.3d 447,

461 (3d Cir. 2009); *Jackson v. Gott*, Civ. No. 13-1705-SLR, 2014 WL 186338, at *3 (D. Del.

Jan. 15, 2014).  The statute of limitations on claims for malicious prosecution begin to run when

"the underlying criminal proceedings are terminated in plaintiff's favor." *Crawford v. Miller*,

269 F. App'x 178, 180 (3d Cir. 2008) (internal quotation marks and citation omitted); *see also*

*Gibbs v. Deckers*, 234 F. Supp. 2d 458, 461 (D. Del. 2002).

In order for Plaintiff's malicious prosecution claim to be timely filed, then, the March

2007 harassment charge must have terminated in Plaintiff's favor no earlier than January 23,

2010.  Plaintiff was found not guilty of the charge. (D.I. 47 at 53; *see also* D.I. 1 at 3, 9)

Although the exact date of the "not guilty" verdict is not explicit in the record, it appears that it

was handed down on or about June 13, 2007, the date on which Homburger testified at the trial about certain comments that she heard Defendant Layfield make. (D.I. 1 at 3, 9)  In any event, the record does make absolutely clear that Plaintiff was found not guilty of the charge by at least October 23, 2009, as a criminal record printout regarding Plaintiff, generated on that date, references the "not guilty" verdict as to the harassment charge at issue. (D.I. 47 at 50, 53)  As Plaintiff did not file her Complaint until January 23, 2012, any malicious prosecution claim against Defendant Layfield in connection with the March 24, 2007 incident is also time-barred by the two-year statute of limitations.[19] *See Crawford*, 269 F. App'x at 180 (affirming district court's grant of summary judgment for defendant on malicious prosecution claim where plaintiff filed her complaint more than two years after dismissal of charges against her).

### b.    Defendant Carlisle

As Defendants accurately point out, (D.I. 53 at 9), Plaintiff makes only a single reference to Defendant Carlisle in her Complaint:  asserting that sometime before December 24, 2008, Defendant Carlisle took a report documenting Breakhouse's continued harassment of Plaintiff. (D.I. 1 at 17-18) This reference to Defendant Carlisle appears in conjunction with Plaintiff's assertions that Troop 7 should have better assisted her regarding the January 5, 2009 incident in which Breakhouse allegedly threatened Plaintiff.  Plaintiff explains that Breakhouse had been harassing Plaintiff prior to this January 5, 2009 incident, and notes that Troop 7 had documented

---

[19]    Plaintiff's claims do not fall under any of the three exceptions listed in the Third Circuit's very limited application of the equitable tolling doctrine:  she does not assert that a defendant has actively misled her with respect to her causes of action, she has not been prevented from asserting her claims as a result of other extraordinary circumstances, and she has not asserted the claims in a timely manner, albeit in the wrong forum. *See Lake v. Arnold*, 232 F.3d 360, 370 & n. 9 (3d Cir. 2000); *see also Manuel v. Mears*, 947 F. Supp. 2d 426, 430 n.3 (D. Del. 2013).

this harassing conduct in various reports—including the report made by Defendant Carlisle. (*Id.*)

In order to bring suit against a defendant under Section 1983, a plaintiff "must allege that a person acting under color of state law deprived plaintiff of [her] constitutional rights." *Thorpe v. Newell*, No. Civ. 05-572-SLR, 2005 WL 2179779, at *2 (D. Del. Sept. 9, 2005) (citing *West*, 487 U.S. at 48). The Court agrees with Defendant Carlisle that Plaintiff's claim here fails as a matter of law because she has not alleged any conduct on Defendant Carlisle's part that constitutes a constitutional violation. *See id.* Other than stating that Defendant Carlisle took down the report at issue, Plaintiff provides no further details regarding the incident, nor as to Defendant Carlisle's related investigation. If anything, Plaintiff appears to make *approving* reference in her Complaint to Defendant Carlisle's actions, as she notes that the report helped to accurately "document[]" Breakhouse's "continued harassment" of her. (D.I. 1 at 18) Although Plaintiff could have attempted to further clarify the nature of Defendant Carlisle's alleged misconduct in her responsive brief, she did not do so; in fact, she there makes no mention of this Defendant or of his police report. (*See* D.I. 65)

Therefore, the Court recommends granting summary judgment on the claim against Defendant Carlisle, as Plaintiff has failed to provide any facts that would support such a claim.

### c.    Defendant Warrington

Plaintiff appears to assert a Section 1983 claim for false arrest in violation of the Fourth Amendment against Defendant Warrington, in connection with the March 7, 2011 arrest. (D.I. 1 at 5 (asserting that Defendant Warrington "intentionally arrested" Plaintiff when "he . . . knew" that the charges were unjustified)) As explained above, a plaintiff asserting such a claim must establish that an arrest was made without probable cause. *James*, 700 F.3d at 680. Defendant

Warrington moves for summary judgment on this claim, on the ground that probable cause existed for the arrest. (D.I. 53 at 13)

Probable cause exists where the facts and circumstances are "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citations omitted); *see also Trice v. Chapman*, Civ. Action No. 12-491-GMS, 2012 WL 3762872, at *5 (D. Del. Aug. 28, 2012). "A police officer may be liable for civil damages for an arrest if 'no reasonable competent officer' would conclude that probable cause exists." *Wilson v. Russo*, 212 F.3d 781, 789-90 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Probable cause . . . does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995). It instead "exists if there is a fair probability that the person committed the crime at issue[,]" *Wilson*, 212 F.3d at 789 (internal quotation marks and citation omitted), and "does not depend on whether the suspect actually committed any crime," *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005).

The Court concludes, based on the facts of record, that Plaintiff has failed to make a sufficient showing that Defendant Warrington lacked probable cause to arrest her on March 7, 2011 on the charges of disorderly conduct[20] and breach of release, violation of a no contact

---

[20]    Del. Code tit. 11, § 1301 states that a person is guilty of disorderly conduct when the "person intentionally causes public inconvenience, annoyance or alarm to any other person, or creates a risk thereof by[,]" *inter alia*, "[e]ngaging in fighting or in violent, tumultuous or threatening behavior" or "[m]aking an unreasonable noise or an offensively coarse utterance, gesture or display, or addressing abusive language to any person present[.]"

order.[21]  (D.I. 54 at A61, at ¶ 5)

With regard to the disorderly conduct charge, the record indicates that on March 7, as

Imperial approached the door of his residence at Unit 303, Plaintiff, who was standing nearby,

"began yelling at him" regarding Plaintiff's continuing ability to remove items from that Unit.

(D.I. 54 at A60, at ¶ 4; *id.* at A66)  When Imperial told Plaintiff he was not going to argue with

her and would instead call police (because Imperial believed Plaintiff was violating the no

contact order), Plaintiff "continued to yell" at him as he walked back into his residence and did

not stop doing so until she saw a police car arrive.  (*Id.* at A66)  (Plaintiff thereafter fled when

the police arrived.).  (*Id.*)  Indeed, the record indicates that Plaintiff did not dispute that she

yelled at Imperial during this exchange.  (*See, e.g., id.* ("[Plaintiff] stated that she was standing in

front of [her residence at Unit 305] while yelling at [Imperial.]"))  This evidence, which was

relayed to Defendant Warrington by fellow officers, (D.I. 54 at A60, at ¶ 5), clearly provided at

least probable cause to believe that Plaintiff was guilty of engaging in disorderly conduct.  *See*

Del. Code tit. 11, § 1301.

As to the breach of release charge,[22] while the record indicates that the no contact order

gave Plaintiff permission to reside at Unit 305 (nearby to the male subjects' residence at Unit

303), it also makes clear that the order expressly forbade Plaintiff from having any contact with

the male subjects, including Imperial.  (D.I. 54 at A43, at ¶ 6; *id.* at A53)  In other words, the

---

[21]     Del. Code tit. 11, § 2113(c) states that "[i]f the accused . . . knowingly breaches any condition of release, each such failure or breach shall be a separate crime[.]"

[22]     With regard to a false arrest claim, to insulate a defendant from liability, a court need find only that probable cause existed as to any one of the charged offenses.  *Johnson v. Knorr*, 477 F.3d 75, 84-85 (3d Cir. 2007).  Nevertheless, the Court will here address both charges for the sake of completeness.

order *did not* permit Plaintiff to have contact with the male subjects as long as she was standing

outside of her own residence at Unit 305. Thus, the record cannot support a finding that probable

cause was lacking as to the arrest on the breach of release charge. *See Johnson v. Bingnear*, Civ.

No. 08-196-LPS, 2010 WL 5395027, at *2, 5-6 (D. Del. Dec. 23, 2010), *aff'd*, 441 F. App'x 848

(3d Cir. 2011) (granting summary judgment in favor of defendants on false arrest claim where

the undisputed evidence showed that plaintiff violated no contact orders, including by making

verbal contact via phone, which was "more than sufficient to warrant a reasonable belief that

[defendant officers] has probable cause to seek arrest warrants, arrest [plaintiff], and initiate

prosecution of [plaintiff] for acts taken by him when he violated the no contact orders"); *see also*

*Trice*, 2012 WL 3762872, at *5.[23]

### d.    Defendant Rowley

---

[23]      To the extent that Plaintiff also intended to assert a claim for malicious
prosecution under Section 1983 in connection with her March 7, 2011 arrest, this claim also fails,
as it requires a finding that probable cause was lacking as to each charge at issue. *See Young v.
City of Pittsburgh*, — F. App'x —, No. 13-2469, 2014 WL 1328005, at *5 (3d Cir. Apr. 4, 2014)
(noting that "[t]he absence of probable cause is an essential element of both false arrest and
malicious prosecution claims, and such claims cannot proceed if probable cause existed");
*Johnson*, 2010 WL 5395027, at *5. For the reasons set out above, Plaintiff has not demonstrated
that a genuine issue of material fact exists on this question; the record indicates there was clearly
at least probable cause to support both charges.

        Furthermore, it could be that Plaintiff intended to assert that even if the warrant
application at issue here contained probable cause, Defendant Warrington violated Plaintiff's
rights because the supporting affidavit included material misrepresentations or omissions. (D.I. 1
at 5 ("The [arrest] documentation contained only information about two of the questioned
witnesses, not all three.")) To make out that type of claim, Plaintiff must show, by a
preponderance of the evidence: "(1) that the police officer knowingly and deliberately, or with a
reckless disregard for the truth, made false statements or omissions that create a falsehood in
applying for a warrant; and (2) that such statements or omissions are material, or necessary, to
the finding of probable cause." *Wilson*, 212 F.3d at 786-87 (internal quotation marks and citation
omitted). If this is what Plaintiff is asserting, she has clearly not satisfied this test here.

Plaintiff asserts claims against Defendant Rowley relating to the March 7, 2011 arrest and the July 21, 2011 incident. (D.I. 1 at 2-3)

### (1)   March 7, 2011 Arrest

In connection with the March 7, 2011 arrest, Plaintiff asserts an illegal search and seizure claim against Defendant Rowley. The Fourth Amendment guarantees the right of individuals to be free from unreasonable searches and seizures. U.S. Const. amend. IV. The determination of whether a search and seizure is unreasonable depends on the related circumstances. *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989); *Murphy v. Mifflin Cnty. Reg'l Police Dep't*, Civil Action No. 1:09-2261, 2012 WL 4025628, at *3 (M.D. Pa. Aug. 2, 2012). Plaintiff argues that her constitutional rights were violated when Defendant Rowley "illegally broke into [P]laintiff's locked motor home . . . without a search warrant or permission." (D.I. 1 at 2)[24] As explained above, an arrest warrant supported by probable cause had been issued with respect to the March 7, 2011 arrest, and Defendant Rowley was acting pursuant to that warrant when he entered Plaintiff's motor home without a search warrant. Thus, resolution of this claim turns on whether Defendant Rowley was permitted to do so under the circumstances.

Here, as an initial matter, it is clear that Defendant Rowley did not need a search warrant in order to arrest Plaintiff. It is well-settled that law enforcement officers who have an arrest warrant for a suspect do not need a search warrant to enter the suspect's home. *Payton v. New York*, 445 U.S. 573, 603 (1980). The reasoning behind this principle is that "an arrest warrant authorizes the police to deprive a person of his liberty, [and so] it necessarily also authorizes a

---

[24]     Plaintiff makes a similar argument in her responsive brief, although she misidentifies Defendant Warrington (instead of Defendant Rowley) as having entered her motor home "without a warrant[.]" (*See* D.I. 65 at ¶ 7)

limited invasion of that person's privacy interest when it is necessary to arrest him in his home."

*Steagald v. United States*, 451 U.S. 204, 214 n.7 (1981). As for the evidentiary showing that

officers must make under these circumstances, the Supreme Court has instructed that "an arrest

warrant founded on probable cause implicitly carries with it the limited authority to enter a

dwelling in which the suspect lives *when there is reason to believe the suspect is within*."

*Payton*, 445 U.S. at 576 (emphasis added). It is not entirely clear whether the "reason to believe"

standard enunciated in *Payton* is identical to the "probable cause" standard, or whether it can

instead be satisfied by some lesser quantum of evidence. The Third Circuit has noted this

uncertainty, but has ultimately declined to decide the issue. *See, e.g.*, *Williams v. City of Phila.*,

454 F. App'x 96, 98 n.2 (3d Cir. 2011); *United States v. Porter*, 281 F. App'x 106, 109 n.3 (3d

Cir. 2008). At least one court in this Circuit has thoroughly examined the issue and concluded

that *Payton*'s reference to "reason to believe" means "probable cause" to believe the suspect is

within the dwelling. *See, e.g.*, *Adams v. Springmeyer*, — F. Supp. 2d — , 2014 WL 1785341, at

\*10-12 (W.D. Pa. May 5, 2014) (discussing ambiguity in the law on this issue and ultimately

concluding that probable cause is required).

     In light of the fact that Defendants themselves suggest that the relevant question here is

whether or not Defendant Rowley had probable cause to believe that Plaintiff was in the motor

home at the time of the arrest, (D.I. 53 at 13-14), the Court will utilize that probable cause

standard here.[25] In doing so, the Court finds that there is a genuine issue of material fact, based

---

[25]    Defendants reference this probable cause standard as part of their argument that
the motor home should be treated as a vehicle, not a home, for Fourth Amendment purposes.
The Supreme Court has held that in order to make a determination as to the appropriate Fourth
Amendment treatment of a motor home, courts should focus on two characteristics of the motor
home: (1) the ready mobility of the vehicle; and (2) whether the vehicle was present in a setting

on the record before it, as to whether Defendant Rowley had probable cause to believe that Plaintiff was inside of the motor home at the time of his entry.[26] The Court comes to this conclusion for the reasons set forth below.

Defendant Rowley points to three key pieces of evidence as indicating he had probable cause to believe that Plaintiff was present inside of the motor home at the time of entry. (D.I. 54 at A34-A35, at ¶ 2) First, DSP dispatch had advised the officers on the scene (who had "set up a perimeter on the [condominium] property") that Plaintiff was currently on the phone with dispatch, that she was speaking on a phone line from a location in the north parking lot, and that

---

that objectively indicates that the vehicle is being used for transportation. *California v. Carney*, 471 U.S. 386, 394 (1985). As is further discussed in this subsection, the evidentiary record before the Court regarding the motor home at issue here is not robust. Based on the fact that Plaintiff appears to acknowledge that the motor home was not being used as her residence, (D.I. 1 at 5 (describing her "residence" as located at Summerlyn Condos Unit 305)), and based on the undisputed fact that the motor home was located in the parking lot of the complex, (D.I. 54 at A34, at ¶ 2), it appears that Plaintiff's motor home should be treated as a vehicle for Fourth Amendment purposes. However, the Court does not believe that this issue ultimately impacts the decision regarding this claim on summary judgment. Even were the motor home to be considered a vehicle, Defendants do not suggest that under these circumstances, Defendant Rowley would not have at least needed probable cause to believe Plaintiff was located inside of the motor home to enter, in order to effectuate her arrest. (D.I. 53 at 13-14); *cf. Carney*, 471 U.S. at 395 (warrantless search of motor home treated as vehicle was reasonable where agents had probable cause to believe that evidence of a crime was located inside motor home); *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (noting that "[o]fficers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains contraband" and that "[t]his automobile exception applies equally to motor homes"); *United States v. Hill*, 855 F.2d 664, 666-67 (10th Cir. 1988) (finding that officers had probable cause to arrest individuals manufacturing drugs on houseboat being treated as a vehicle where, *inter alia*, a witness told officers that the individuals were on the boat).

[26]    It is worth noting that the Court would also find that a genuine issue of material fact exists were it utilizing a "reason to believe" standard that differed in some way from the probable cause standard. *See Allen v Gillenwater*, No. 1:10-CV-359, 2012 WL 3475583, at *10 (M.D.N.C. Aug. 15, 2012) (explaining that a "'reason to believe' is more than a suspicion and more than a hunch").

this call was occurring approximately fifteen to twenty minutes from when it was first reported

that Plaintiff had fled her dwelling (Unit 305). (*Id.*) Second, Defendant Rowley then observed

the motor home in the north parking lot and saw that it had an open door with a mattress

"propped on an angle at the door"; through that door, he reports that he could see a walker that he

believed belonged to Plaintiff. (*Id.*) Third, Defendant Rowley asserts that as he approached the

motor home, he could "hear" movement inside of it. (*Id.*) He was then directed to and did enter

the motor home, leading to Plaintiff's arrest. (*Id.*)

However, as to each of these key pieces of evidence, Plaintiff paints a contradictory

factual picture. Plaintiff acknowledges that she had spoken to a DSP dispatcher prior to her

arrest and after fleeing Unit 305—but she alleges that this call, which lasted for approximately

four minutes, was made approximately twenty-five minutes before the police entered the motor

home. (D.I. 1 at 5) And Plaintiff contends that, contrary to Defendant Rowley's allegations, the

front and side doors of the motor home were both locked prior to the arrest, and that "[a]ll of the

windows were covered with curtains and a mattress was covering the locked side door." (*Id.* at

2)

The issue is a close one. However, after considering these conflicting portions of the

record, drawing all reasonable inferences in favor of the nonmoving party, and refraining from

making credibility determinations or weighing the evidence, the Court concludes that a grant of

summary judgment is not appropriate.[27] First, as for Plaintiff's phone call to DSP dispatch—the

---

[27]     Qualified immunity "is an affirmative defense that must be pleaded by a defendant
official[,]" *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982), and a defendant official asserting
qualified immunity bears the burden of establishing an entitlement to same, *Beers-Capitol v.
Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001); *Neuberger v. Gordon*, 567 F. Supp. 2d 622, 638
(D. Del. 2008). Defendant Rowley did not raise a qualified immunity defense with respect to this

call that Defendant Rowley references as confirmatory evidence that Plaintiff was actually in the

north parking lot just prior to the arrest—Plaintiff contends that the call had instead concluded

twenty minutes earlier. Thus, if Plaintiff's version of events is believed, Defendant Rowley

could not have obtained this key contemporaneous evidence of Plaintiff's location when he says

he did; this would eliminate an important component of the basis for his reason to believe

Plaintiff was in a motor home located in that lot at the time of arrest. Second, as to the ability to

see inside of the motor home, Plaintiff contends that the doors to the motor home were closed

and locked and the windows covered at the time; in such a circumstance, it would be impossible

for Defendant Rowley to have actually seen Plaintiff's walker or anything else inside the vehicle

that might have suggested Plaintiff's presence. Third, this set of facts (as to all windows and

doors of the motor home being closed and locked), if believed, would also make it more difficult

for Defendant Rowley to have heard any movement inside the motor home.

The sparse record before the Court relating to the motor home and Defendant Rowley's

entry therein is also a factor in the Court's decision. For one, there is no indication in the record

that Defendant Rowley or the other officers present at the scene knew or confirmed that the

motor home belonged to Plaintiff prior to entry. Moreover, the record does not provide much

information regarding the area in which the motor home was located, such as an indication as to

whether the motor home was one of only a few places in the surrounding area where Plaintiff

could have been located in the wake of her flight. Put another way, there might have been

---

claim. (*See* D.I. 18; D.I. 53 at 13-14) Therefore, the Court does not analyze whether Defendant
Rowley is entitled to qualified immunity for the claim. *See Platt v. Brockenborough*, 476 F.
Supp. 2d 467, 472 n.3 (E.D. Pa. 2007) (declining to analzye qualified immunity where
defendants did not raise such a defense); *Maslow v. Evans*, No. 01-CV-3636, 2003 WL
22594577, at *25 (E.D. Pa. Nov. 7, 2003) (same).

additional facts that led Defendant Rowley and the other officers to think that Plaintiff was likely

in this motor home, but those facts are not of record.  It is possible that a fuller factual record

may have compelled a different outcome, but on the record before it, the Court recommends that

summary judgment be denied with respect to Plaintiff's illegal search and seizure claim against

Defendant Rowley. *Cf. Allen v Gillenwater*, No. 1:10-CV-359, 2012 WL 3475583, at *10

(M.D.N.C. Aug. 15, 2012) (finding that officers did not have "reason to believe" that plaintiff

was inside mother's residence where, *inter alia*, no witness reported to law enforcement that he

was inside and there were no visible signs that he was present).

### (2)     July 21, 2011 Incident

Plaintiff also appears to assert Section 1983 claims for false arrest and malicious

prosecution against Defendant Rowley in connection with the July 21, 2011 incident involving

Marchone.  (D.I. 1 at 2-3 (referencing "untrue, unsubstantiated and retaliatory charges" filed by

Defendant Rowley on that date))  Following Defendant Rowley's interview with Marchone,

Plaintiff was arrested on charges of terroristic threatening,[28] theft under $1,500,[29] harassment,[30]

---

[28]     Del. Code tit. 11, § 621 states that a person is guilty of terroristic threatening when, *inter alia*, the person "threatens to commit any crime likely to result in death or in serious injury to person or property."

[29]     Del. Code tit. 11, § 841 states that a person is guilty of theft, *inter alia*, "when the person takes, exercises control over or obtains property of another person intending to deprive that person of it or appropriate it."

[30]     Del. Code tit. 11, § 1311 states that a person is guilty of harassment when, with the intent to harass, annoy or alarm another person, *inter alia*, "[t]hat person . . . engages in any other course of alarming or distressing conduct which serves no legitimate purpose and is in a manner which the person knows is likely to provoke a violent or disorderly response or cause a reasonable person to suffer fear, alarm, or distress."

and criminal trespass first degree.[31]  Here, even viewing the evidence in the light most favorable

to Plaintiff, the record clearly indicates that probable cause existed for the arrest, and therefore

both claims fail as a matter of law.  *Young*, 2014 WL 1328005, at *5; *Johnson*, 2010 WL

5395027, at *5.

      In arguing that Defendant Rowley filed untrue and unsubstantiated charges against

Plaintiff in connection with this arrest, Plaintiff points to certain purportedly exculpatory

evidence that he failed to obtain.  She asserts that medical records would have proven that she

could not have stolen Marchone's license plate, as conditions in her fingers would have rendered

it impossible to hold a screw driver and loosen the screws of the license plate.  (D.I. 1 at 2-3)

Plaintiff also contends that, while the arrest warrant charging her with harassment states that she

repeatedly called Marchone on the day of arrest, phone records would have shown that this was

untrue.  (*Id.* at 3; *see also* D.I. 54 at A40)  Plaintiff further asserts that she witnessed Marchone

taking several oxycontin pills less than an hour before he spoke with Defendant Rowley, and that

Marchone was under the influence of drugs when he gave the report.  (D.I. 1 at 3)  Finally, she

points out that prior to completing the warrant, Defendant Rowley failed to interview Plaintiff or

any other witnesses, such as Bonnie Helder, the owner of Marchone's residence (who Plaintiff

contends let her inside).  (*Id.* at 2-3)

      The probable cause inquiry requires courts to determine whether, "at the moment the

arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which

they had reasonably trustworthy information were sufficient to warrant a prudent man in

---

[31]     Del. Code tit. 11, § 823 states that a person is guilty of criminal trespass in the
first degree "when the person knowingly enters or remains unlawfully in a dwelling[.]"

believing that [the suspect] had committed or was committing an offense." *Napier v. City of New Castle*, 407 F. App'x 578, 583 (3d Cir. 2010) (internal quotation marks and citations omitted). Here, Defendant Rowley filed an arrest warrant based on an interview that he conducted with Marchone, in which Marchone stated that: (1) Plaintiff had harassed him that day by phone and in person about money owed to her; (2) she had entered his residence without permission; (3) she had threatened to have him followed and physically harmed if he left his apartment; and (4) she had threatened to remove a license plate from his car to keep him from fleeing. (D.I. 54 at A35, at ¶ 3; *id.* at A38-41) Defendant Rowley also noted at least some additional evidence that corroborated Marchone's report (i.e., the fact that Marchone's license plate was in fact missing thereafter). (D.I. 54 at A38-A41; *see also* D.I. 53 at 14) "Generally, police may rely on the statements of a victim . . . to a crime when making a probable cause determination as it is well-established that when an officer has received . . . information from some person—normally the putative victim []—who it seems reasonable to believe is telling the truth, he has probable cause." *Quinn v. Cintron*, Civil Action No. 11-02471, 2013 WL 5508667, at *4 (E.D. Pa. Oct. 3, 2013); *see also Anderson v. Goga*, Civil Action No. 11-528, 2013 WL 3242445, at *2-3 (W.D. Pa. June 25, 2013).

There is no indication here that it was unreasonable for Defendant Rowley to believe Marchone's detailed report. Even if Plaintiff witnessed Marchone ingest several prescription drugs shortly before he spoke with Defendant Rowley, there is no evidence to suggest that Marchone acted in an abnormal manner during that interview. And indeed, at least with respect to the terroristic threatening and harassment charges, Plaintiff admits that she was present at his dwelling on the day in question, and does not deny making the threatening statements to

Marchone. (D.I. 1 at 2-3)

As for the pieces of evidence and witness statements that Plaintiff contends should have been gathered prior to Defendant Rowley's obtaining an arrest warrant, it is well-settled that once probable cause to arrest exists in an officer's mind, he is not required to investigate further. *Livingston v. Allegheny Cnty.*, 400 F. App'x 659, 666 (3d Cir. 2010); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000). For this reason, courts consistently reject arguments similar to Plaintiff's here—that an officer failed to complete, in the eyes of the arrestee, an adequate investigation, and that probable cause was therefore lacking. *See, e.g.*, *Merkle*, 211 F.3d at 790 n.8 (rejecting plaintiff's argument that officer lacked probable cause because he failed to interview plaintiff herself and other witnesses before arresting plaintiff, and finding that credible report from one witness alone sufficiently established probable cause); *Adams*, 779 F. Supp. 2d at 387 (finding that defendants had probable cause to arrest plaintiff and rejecting argument that officers should have subpoenaed telephone records and independently investigated whether harassing text message had come from plaintiff's cell phone); *Wooleyhan v. Cape Henlopen Sch. Dist.*, Civil Action No. 10-153, 2011 WL 1875710, at *10 (D. Del. May 17, 2011) (officer had no duty to collect additional witness statements prior to establishing probable cause).[32] In this vein, *inter alia*, an officer's failure to interview the arrestee prior to filing charges does not serve as a barrier to probable cause. *Anderson*, 2013 WL 3242445, at *3 (citing cases). This is so because "[m]any putative defendants protest their innocence, and it is not the

---

[32]     *See also Craig v. Collins*, Civil Action No. 13-1873, 2013 WL 5271521, at *7 (E.D. Pa. Sept. 17, 2013) (noting that "a plaintiff cannot succeed [on a false arrest claim] by merely showing that the police could have done a better job of investigating or failed to exhaust all leads after they had enough information to establish probable cause").

responsibility of law enforcement officials to test such claims once probable cause has been established." *Id.* (internal quotation marks and citation omitted).

Here, the evidence shows that Defendant Rowley had probable cause to support the charges against Plaintiff, and any arguable deficiencies in Defendant Rowley's investigation do not negate his reasonable belief that all elements of the charged crimes existed.[33] Therefore, Plaintiff's claims for false arrest and malicious prosecution in connection with the July 21, 2011 incident fail.[34]

### e.     Defendant O'Neil

Plaintiff appears to assert a claim pursuant to Section 1983 against Defendant O'Neil for his failure to "perform a complete investigation" in connection with the September 16, 2011 incident between Plaintiff and Regibal. (D.I. 1 at 6)  Neither Plaintiff nor Regibal were arrested following that altercation between them. (*Id.* at 10; D.I. 54 at A33, at ¶¶ 2-3)

"Section 1983 is not self-executing nor is it a vehicle for complaining about every act which the plaintiff believes aggrieved him." *Freeman v. Gay*, Nos. 3:11-0867, 3:11-1094, 2012 WL 2061557, at *13 (M.D. Tenn. June 7, 2012). Rather, in order to succeed on a Section 1983

---

[33]     Defendant Rowley obtained an arrest warrant for Plaintiff's arrest. As previously noted, where an arrest is made pursuant to a warrant, a plaintiff may succeed in a Section 1983 action for false arrest if she shows, by a preponderance of the evidence: "(1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 786-87 (internal quotation marks and citation omitted). Plaintiff has not sufficiently demonstrated that Defendant Rowley had reason to doubt the evidence supporting the arrest warrant.

[34]     Although Plaintiff points out that all charges were ultimately dropped, this has no effect on the claims at issue, as "the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime." *Wright*, 409 F.3d at 602.

claim, a plaintiff must establish, *inter alia*, that the defendant's conduct deprived the plaintiff of a constitutional right. *West*, 487 U.S. at 48.

Plaintiff has failed to do so here. It is well-settled that individuals do not have a right under the Constitution to a specific type of police investigation. *Wilson*, 212 F.3d at 793 n.11 (rejecting plaintiff's "suggestion that he has a due process claim because [defendant police officer] should have done a better job of post-arrest investigation") (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)); *Whitehead v. City of Phila.*, Civil Action No. 13-2167, 2014 WL 657486, at *2 (E.D. Pa. Feb. 19, 2014). Nor do individuals have a constitutional right to have other people prosecuted. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 767 n.13 (2005); *Segreti v. Borough of Wilkinsburg*, Civil Action No. 09-1511, 2011 WL 284130, at *6 (W.D. Pa. Jan. 26, 2011) (concluding that plaintiff's "allegations regarding the failure of the police to more thoroughly investigate and prosecute the individuals involved in the [subject] incident . . . do not state a claim recognized under the Constitution"). Therefore, even assuming that Trooper O'Neil's investigation of the September 16, 2011 incident was incomplete in some way, in the absence of any allegation that he deprived Plaintiff of a constitutional right, Plaintiff's claim fails as a matter of law.

### f.    Defendant Dixon

Defendant Dixon moves for summary judgment on the ground that the claim against him appears to be based not on his "actual involvement in any unfair actions taken against [P]laintiff[,]" but rather on his role as a supervisor. (D.I. 53 at 16-17)  It is well-settled that a Section 1983 claim cannot be premised upon a theory of respondeat superior. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675-77 (2009); *Argueta v. U.S. Immigration & Customs Enforcement*, 643

F.3d 60, 71-72 (3d Cir. 2011); *Stones v. McDonald*, — F. Supp. 2d — , Civ. No. 12-711-SLR,

2014 WL 26810, at *7 (D. Del. Jan. 2, 2014).  As the Supreme Court observed in *Iqbal*, "in a

[Section] 1983 suit . . . where masters do not answer for the torts of their servants—the term

'supervisory liability' is a misnomer." *Iqbal*, 556 U.S. at 677.  Because vicarious liability is

inapplicable to Section 1983 suits, "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." *Argueta*,

643 F.3d at 71 (internal quotation marks and citation omitted).

Under pre-*Iqbal* Third Circuit precedent, there are two theories of supervisory liability

under which a supervising official may be held personally liable pursuant to Section 1983.  *See*

*Blake v. Danberg*, Civ. No. 11-146-LPS, 2013 WL 3957011, at *5 (D. Del. July 29, 2013).  That

is, supervising officials could be held liable for actions taken in their official capacity if:  (1) as

policymakers, they, "with deliberate indifference to the consequences, established and

maintained a policy, practice or custom which directly caused [the] constitutional harm"; or (2)

they "participated in violating the plaintiff's rights, directed others to violate them, or, as the

person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." *A.M.*

*ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal

quotation marks and citations omitted); *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 129

n.5 (3d Cir. 2010); *Blake*, 2013 WL 3957011, at *5.  Under the second theory, in order to

sufficiently allege that a defendant knew of and acquiesced in his subordinate's unconstitutional

conduct, a plaintiff was required to demonstrate a defendant's:  (1) contemporaneous knowledge

of the offending incident or knowledge of a prior pattern of similar incidents and circumstances;

and (2) actions or inactions which communicated approval of the subordinate's behavior.

*Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997); *cf. Abney v. Younker*, No. 1:13-cv-01418, 2014 WL 901109, at *5 (M.D. Pa. Mar. 7, 2014).

The Third Circuit has expressed uncertainty regarding the viability and scope of supervisory liability in the wake of *Iqbal*, but, to date, has declined to determine whether *Iqbal* requires supervisory liability to be narrowed or eliminated altogether. *See Santiago*, 629 F.3d at 130 n.8; *Blake*, 2013 WL 3957011, at *5. Our Court has thus noted that, "[h]ence, it appears that, under a supervisory theory of liability, and even in light of *Iqbal*, personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's constitutional right." *Blake*, 2013 WL 3957011, at *5.

Plaintiff's claim against Defendant Dixon appears to be based on a "knowledge" and "acquiescence" theory of supervisory liability. (*See* D.I. 1 at 7, 12) She asserts that Defendant Dixon met with her several times in 2011 regarding Plaintiff's relationship with Troop 7, but that thereafter, he "failed to stop the police harassment." (*Id.* at 7) Although Plaintiff fails to identify many of these specific incidents of "harassment," she does cite to the September 16, 2011 incident with Defendant O'Neil and the December 31, 2011 incident with Defendant Warrington as examples of the later-continuing mistreatment. (*Id.*)

The Court has real doubt that, after *Iqbal*, Plaintiff's claim of supervisory liability, based on a "knowledge" and "acquiescence" theory, could ever be viable. *See, e.g., Iqbal*, 556 U.S. at 677 (rejecting contention that supervisor could be liable for knowledge and acquiescence in their subordinates' use of discriminatory criteria to make certain decisions, as that is "inconsistent with [the law, which requires that a supervisor] is only liable for his or her own misconduct"); *Smith v. Hayman*, Civil Action No. 09-2602 (PGS), 2012 WL 161817, at *7 (D.N.J. Jan. 19,

2012) ("The Court [in *Iqbal*] rejected the contention that supervisor liability can be imposed where the official had only 'knowledge' or 'acquiesced' in their subordinates['] conduct."). Even if it somehow could, Plaintiff's claim would fail. This is because—even assuming Defendant Dixon had knowledge of certain (unspecified) alleged misconduct on the part of Troop 7 officers—the record is devoid of any evidence demonstrating that Defendant Dixon thereafter acquiesced in similar misconduct. Indeed, Plaintiff appears to allege just the opposite, asserting that after meeting with Plaintiff in 2011, Defendant Dixon informed the Troop 7 officers via e-mail to treat all new complaints (including any complaints filed by Plaintiff) fairly and unbiasedly. (D.I. 1 at 7) The referenced e-mail could not be reasonably viewed as amounting to a message that Defendant Dixon approved of any misconduct, and there are no further facts of record indicating such approval of any officer misdeeds. Instead, Plaintiff acknowledges that Defendant Dixon otherwise acted in a "proper, reasonable and lawful" manner; he was only included as a defendant "because his actions did not improve the situation." (*Id.* at 9)[35]

---

[35]    Plaintiff's supervisory liability claim against Defendant Dixon also fails because any such claim would necessarily include, as a requisite element, actual violations at the hands of his subordinates. The only two types of conduct that Plaintiff calls out with any specificity as to Defendant Dixon's supervisory role relate to the actions of Defendant Warrington and Defendant O'Neil. (D.I. 1 at 7) However, as discussed previously, Plaintiff has failed to point to facts that could sufficiently establish constitutional violations by those Defendants, and thus she cannot maintain an action against Defendant Dixon predicated on the actions of Defendants Warrington and O'Neil. *See, e.g., Kearney v. Wadsworth*, Civil No. 1:13-CV-1850, 2014 WL 1339665, at *9 (M.D. Pa. Apr. 3, 2014) (dismissing supervisor defendant from action where plaintiff alleged that supervisor had knowledge of and acquiesced in a subordinate's alleged violations of plaintiff's constitutional rights, but defendant failed to show an actual violation at the hands of the subordinate); *see also Young v. City of Pittsburgh*, No. 11-650, 2013 WL 1290950, at *10 (W.D. Pa. Mar. 26, 2013) (granting summary judgment for defendants on supervisory liability claim where plaintiff failed to prove an underlying constitutional violation on the part of defendants' subordinates), *aff'd*, --- F. App'x ---, 2014 WL 1328005, at *6 (3d Cir. Apr. 4, 2014).

In sum, in the absence of any personal involvement by Defendant Dixon in any alleged misconduct, and in the absence of any alleged action or inaction on his part that could be interpreted as constituting approval of such misconduct, the Court recommends that summary judgment be entered in Defendant Dixon's favor.[36]

### g.    Defendant Whaley and Defendant Barnett

Plaintiff's claims against Defendant Whaley and Defendant Barnett also appear to be largely predicated on their roles as supervisors at Troop 7. (D.I. 1 at 2, 4) These Defendants move for summary judgment on the ground that, *inter alia*, Plaintiff "has failed to allege or set forth claims of constitutional violations against individual troopers and cannot attempt to assert a derivative supervisory claim against [Defendants] Whaley and Barnett." (D.I. 53 at 18) The Court finds that Plaintiff's claims against Defendant Whaley and Defendant Barnett fail as a matter of law.

As to Plaintiff's supervisory liability claims, Plaintiff's allegations that Defendant Whaley and Defendant Barnett seemingly condoned the actions of their subordinates and were

---

[36]    *Compare Cordial v. Atl. City*, Civil No. 1:11-cv-01457 (RMB/AMD), 2014 WL 1095584, at *10 (D.N.J. Mar. 19, 2014) (denying summary judgment on supervisory liability claim against defendant police chief where it was reasonable to conclude that defendant knew of misconduct regarding excessive force but never discussed it with offending officer or suggested additional training on use of force), *with Harris v. Barone*, C.A. No. 11-256 Erie, 2012 WL 6860243, at *4-5 (W.D. Pa. Dec. 26, 2012) (granting summary judgment in favor of defendant supervisor where nothing in record supported finding that defendant's "alleged inaction communicated a message of approval regarding the" alleged misconduct, and indeed the evidence showed that "rather than exhibiting deliberate indifference or conveying a message of approval through inaction," the defendant "initiated an investigation of [p]laintiff's concerns"), *and Ali v. Kasprenski*, 732 F. Supp. 2d 439, 445 (D. Del. 2010) (granting motion for summary judgment on supervisory liability claim where, subsequent to an alleged incident involving defendant supervisors' subordinate, they "took action in an effort to discover what actually occurred between plaintiff and [the subordinate]").

derelict in their supervisory duties are too conclusory and unspecific to survive summary

judgment. (D.I. 1 at 2, 4)  Plaintiff has provided no specific facts to support a claim that either of

these Defendants personally violated her constitutional rights, that they expressly directed the

deprivation of her constitutional rights, or that they created policies that directly caused

constitutional harm to Plaintiff. *See, e.g., Rushing*, 2013 WL 5435785, at *4.  Nor has she pled

sufficient facts demonstrating that either defendant had contemporaneous knowledge of, or

acquiesced to, any constitutional violations committed by their subordinates. *See, e.g., Gumbs v.

O'Connor*, Civil Action No. 10-1520 (MLC), 2012 WL 95355, at *5 (D.N.J. Jan. 12, 2012)

(plaintiff failed to assert cause of action against supervisor where he argued that supervisor knew

of the violations that were committed and did nothing to prevent them but failed to "describe the

alleged violations to which he refers, when [the supervisor] allegedly knew about them or the

alleged extent of [the supervisor's] knowledge").[37]  Therefore, the Court recommends that

summary judgment be granted on these claims made against Defendant Whaley and Defendant

Barnett.

### h.    Defendant Hardy

Plaintiff asserts that over the course of a decade, beginning in 1998 and continuing until

his retirement from Troop 7, Defendant Hardy filed false charges against Plaintiff and "abuse[d]

his power and acted in a retaliatory, harassing, unprofessional and negligent manner" towards

---

[37]    To the extent that Plaintiff asserts a supervisory liability claim against Defendant
Barnett in connection with the September 16, 2011 incident involving Defendant O'Neil,
(*see* D.I. 1 at 6), the claim fails. As explained above, any such claim would necessarily include
as a requisite element an actual constitutional violation at the hands of Defendant O'Neil. Yet
because a violation on Defendant O'Neil's part could not be established, Plaintiff cannot
maintain an action on the basis of supervisory liability against Defendant Barnett. *See, e.g.,
Kearney*, 2014 WL 1339665, at *9; *Young*, 2013 WL 1290950, at *10.

her. (D.I. 1 at 6)  The only specific example of false charges that she cites to is a 1998 arrest for offensive touching that resulted in a not guilty verdict.  (*Id.*)  During this time period, Plaintiff further appears to assert a claim for supervisory liability against Defendant Hardy, alleging that he failed to reprimand his subordinates when they acted inappropriately and condoned, conspired and participated in such behavior.  (*Id.*)

Aside from the false arrest that occurred in 1998, Plaintiff fails to identify specific dates on which Defendant Hardy's alleged misconduct occurred.  It is clear, however, that such incidents occurred during the time frame between 1998 and Defendant Hardy's retirement in 2009.  (D.I. 1 at 6; D.I. 54 at A85, at ¶ 1)  Plaintiff filed her Complaint on January 23, 2012, more than two years after Defendant Hardy retired.  As explained above, Section 1983 claims are subject to a two-year limitations period.  Del. Code tit. 10, § 8119; *McDowell*, 88 F.3d at 190. Plaintiff does not address Defendant Hardy's statute of limitations argument, (*see* D.I. 53 at 16-17), in her responsive brief.  Nor does she give any reason to indicate that, although the incidents in question clearly happened no later than 2009, her causes of action began to accrue after 2009, such that the claims might be timely.

Accordingly, Plaintiff's Section 1983 claims against Defendant Hardy are time-barred, as they should have been filed by no later than 2011 (and perhaps even earlier, depending on when the underlying specific incidents actually occurred).  The Court recommends that summary judgment be entered in Defendant Hardy's favor.

### i.    **Defendant Stetser**

Plaintiff asserts claims against Defendant Stetser in connection with the March 5, 2011 incident, which resulted in three charges of harassment against Plaintiff.  (D.I. 1 at 2, 12-14)

Plaintiff accuses Defendant Stetser of performing a "shoddy, haphazard investigation" and preparing a narrative report that contained "23 false, inaccurate and/or opinionated statements[.]" (*Id.* at 2 (emphasis omitted), 12) According to Plaintiff's Complaint, Defendant Stetser was "negligent in her professional duties" in this regard and "maliciously filed . . . . unsubstantiated" charges against Plaintiff. (*Id.* at 2)

To the extent that Plaintiff asserts a claim against Defendant Stetser for conducting a negligent investigation, she fails to state an actionable claim under Section 1983. It is well-settled that there is no constitutional right to an accurate police report. *Jarrett v. Twp. of Bensalem*, 312 F. App'x 505, 507 (3d Cir. 2009); *Martin v. City of Reading*, Civil Action No. 12-CV-03665, 2013 WL 5429358, at *8 n.44 (E.D. Pa. Sept. 30, 2013). Nor does an individual have a constitutional right to a flawless police investigation. *Baker v. McCollan*, 443 U.S. 137, 146 (1979) (stating that "official charged with maintaining custody of the accused named in the warrant [is not] required by the Constitution to perform an error-free investigation of such a claim"); *Whitehead*, 2014 WL 657486, at *2 (explaining that "[e]ven a negligent police investigation . . . cannot serve as the basis for a constitutional claim"); *Holmes v. Cnty. of Del.*, Civil Action No. 04-4794, 2007 WL 954122, at *4 (E.D. Pa. Mar. 28, 2007).

As was previously noted, however, it is possible for a plaintiff to state a false arrest claim based on a false police report. "[A]n arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest." *Wilson*, 212 F.3d at 786. "[A] plaintiff may succeed in [an] action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for

a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Id.* at 786-87 (internal quotation marks and citation omitted).

Plaintiff does not set out the alleged misstatements at issue here in easy-to-follow, numerical fashion—and in fact does not specifically identify all 23 purported errors. But she does cite to certain of the purported problems, some of which are found in the arrest warrant narrative, and others of which are found in Defendant Stetser's more detailed corresponding Crime Report. Plaintiff identifies the following issues:

- Trooper Stetser ignored two witness statements contradicting Imperial's version of events. (D.I. 1 at 12) Although Imperial represented to Defendant Stetser that he was present at Unit 303 on March 4, 2011, he was not. (*Id.*) The statements confirmed that he was at Unit 305 for most of the evening. (*Id.*)

- Although Trooper Stetser wrote in the Crime Report and warrant that "[Plaintiff] stated that she had re-rented her residence to [the male subjects] who were refusing her entry[,]" Plaintiff "definitely did not say that she re-rented her residence. She never even met one of the three subjects until she was out of the hospital." (*Id.* at 13)

- Although the Crime Report "made it sound" like Plaintiff was at the unit for "weeks or months[,]" she was only there for 24 hours. (*Id.*)

- Defendant Sietser wrote that she allowed Plaintiff to "locate all of her medication[,]" (D.I. 54 at A52), but failed to mention that the medication was "withheld for almost two hours[,]" (D.I. 1 at 13).

- Defendant Stetser wrote that Abernathy "said that his life was never threatened in any way by [Outten]." (D.I. 54 at A48) However, Abernathy "called the police because he definitely was threatened by [Outten]. He told Stetser that he was threatened, but her report stated otherwise." (D.I. 1

at 14 (emphasis omitted))[38]

Defendant's Stetser's March 5, 2011 investigation ultimately resulted in the filing of three charges against Plaintiff: one count of harassment, in violation of Del. Code tit. 11, § 1311, for each of the three male subjects.[39] (D.I. 54 at A57) The arrest warrant indicates that on the evening of March 4, 2011, Plaintiff directed repeated comments towards Outten during an argument, as witnessed by both Freeman and Imperial, and on March 5, 2011, Defendant Stetser herself observed Plaintiff make several "loud" statements to Freeman and Imperial in a "harassing, annoying" manner that appeared intended to start "verbal confrontations." (*Id.* at A43 at ¶ 5; *id.* at A59) These comments were the impetus for the harassment charges. (*Id.*)

The fatal flaw in Plaintiff's false arrest claim is that, even assuming that Plaintiff could satisfy the first hurdle of the *Wilson* test (i.e., that false statements or omissions were made), she would fail on the second, as the purported false statements clearly do *not* concern and are *not* material to the specific conduct that generated the harassment charges. In other words, Plaintiff

---

[38] The Court can quickly dispose of certain other statements that Plaintiff identifies as problematic. Plaintiff accuses Defendant Stetser of recording her opinions in the report, rather than the facts. (D.I. 1 at 13) However, the Court is aware of no bar to inclusion of an officer's opinions in a narrative police report. *Cf. United States v. Dowdell*, 595 F.3d 50, 58 (1st Cir. 2010) (noting that conclusions or opinions of police officers are normally contained in police reports) (citation omitted); *Hickenbottom v. Nassan*, Civil Action No. 03-223, 2007 WL 7753803, at *6 n.6 (W.D. Pa. Mar. 29, 2007) (same). Plaintiff also complains that Defendant Stetser made it appear that she spoke to Plaintiff first, when in actuality Plaintiff was the last individual interviewed. (D.I. 1 at 12-13) While the arrest warrant could be read this way, the corresponding Crime Report makes it clear that Defendant Stetser spoke to several individuals before interviewing Plaintiff. (D.I. 54 at A47-A48) Furthermore, Plaintiff contends that Defendant Stetser's report falsely stated that Plaintiff "was at a Lewes location harassing an alleged male for the last thirty days." (D.I. 1 at 13) However, such a statement does not appear anywhere in either the arrest warrant or Crime Report.

[39] See *supra* note 30 for the elements of this crime.

does not take issue with Defendant Stetser's reporting of the actual comments that are asserted to have constituted harassment. The first asserted false statement listed above is the only one remotely connected to the actual charged conduct. However, even assuming that Imperial was not present for most of the evening of March 4, 2011, he was not the sole witness to Plaintiff's earlier conduct that evening. (*Id.* at A49) Moreover, it is undisputed that Imperial was present during the relevant time period on March 5, 2011, when Plaintiff made some of the comments for which she was charged. (*Id.* at A48-A49)

Thus, even if the above statements were excised from the warrant and corresponding Crime Report, the facts set forth therein would have nevertheless clearly established probable cause for the three counts of harassment. Defendant Stetser had a report from Freeman (a victim and witness to the harassing comments made on March 4) and had herself witnessed Plaintiff's comments made on March 5. And significantly, although Plaintiff refers to the charges as "unsubstantiated[,]" (D.I. 1 at 2), she never actually disputes making harassing comments to the male subjects. The evidence was sufficient to establish "a fair probability that [Plaintiff] committed the crime at issue." *Wilson*, 212 F.3d at 789 (internal quotation marks and citation omitted).[40]

Plaintiff also alleges that Defendant Stetser "conspired with other Troop 7 officers to have [P]laintiff re-arrested for violating a no contact order 2 days after she witnessed [a state court judge] give Plaintiff permission to live within 100 yards, two condos away." (D.I. 1 at 12) This is a reference to the March 7, 2011 arrest.

---

[40]     To the extent that Plaintiff also asserts a malicious prosecution claim in connection with the harassment charges, this claim also fails since the Court finds that probable cause existed for the charged crimes. *See Johnson*, 2010 WL 5395027, at *5.

To establish civil conspiracy under Section 1983, a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Thorpe v. Little*, 804 F. Supp. 2d 174, 188 (D. Del. 2011); *Savage v. Judge*, 644 F. Supp. 2d 550, 561 (E.D. Pa. 2009). Plaintiff points to no record evidence showing that Defendant Stetser was personally involved in the March 7, 2011 arrest, and she provides no further factual detail regarding an alleged conspiracy between Defendant Stetser and other Troop 7 officers. Accordingly, her bare allegations fail to sufficiently establish the required elements comprising a civil conspiracy claim. *See Maslow v. Evans*, No. 01-CV-3636, 2003 WL 22594577, at *25 (E.D. Pa. Nov. 7, 2003) (finding that plaintiffs' vague allegations as to civil conspiracy were insufficient to overcome summary judgment). Moreover, even assuming that Plaintiff had sufficiently described the existence of an agreement between Defendant Stetser and other Troop 7 officers relating to the arrest, the Court has already concluded that there was probable cause supporting the arrest. *Gibbs v. Hartsky*, No. Civ.A.98-787 JJF, 2004 WL 1328278, at *3 (D. Del. Mar. 31, 2004) (granting summary judgment for defendant on civil conspiracy claim, as there was probable cause for arrest and therefore plaintiff failed to establish an underlying constitutional injury). For all of these reasons, Plaintiff's civil conspiracy claim fails as a matter of law.

Plaintiff also alleges that Defendant Stetser "discriminated against" Plaintiff by arresting her instead of Outten. (D.I. 1 at 14) The Court construes this claim as a Section 1983 claim for the denial of equal protection. To prevail on such a claim, a plaintiff must prove that she was subject to "purposeful discrimination." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005); *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992);

*Hibbard v. Penn-Trafford Sch. Dist.*, Civ. Action No. 13-622, 2014 WL 640253, at *20 (W.D.

Pa. Feb. 19, 2014). In addition, to state a claim under the Equal Protection Clause, a Section

1983 plaintiff must allege and prove that a state actor intentionally discriminated against her

because of her membership in a protected class. *Hibbard*, 2014 WL 640253, at *20.

Glaringly absent from Plaintiff's Complaint is any allegation indicating the specific type

of discrimination that Defendant Stetser purportedly practiced here. It therefore follows that

Plaintiff has failed to set out the requisite elements for such a claim, let alone point to evidence

that would support such a claim. To the extent that Plaintiff intended to state an equal protection

claim on the basis of gender discrimination, Plaintiff, at a minimum, fails to allege facts which

raise the possibility that Defendant Stetser purposefully discriminated against Plaintiff because

her gender. For these reasons, Plaintiff's equal protection claim must fail. *Cf. id.* (dismissing

plaintiff's Section 1983 gender discrimination claims against defendant where she failed to allege

facts showing that defendant purposefully discriminated against plaintiff because of her gender);

*Mack v. Fed. Bureau of Prisons*, C/A No. 4:10-567-HMH-TER, 2011 WL 3419376, at *5

(D.S.C. May 23, 2011) (granting summary judgment on equal protection claim where plaintiff

failed to put forward factual allegations showing that he was victimized because of some suspect

classification).[41]

### j.   Defendant Ralston

Plaintiff appears to assert a claim against Defendant Ralston for failing to arrest

---

[41]     Defendants argue that certain Defendants, including Defendant Stetser, are entitled to qualified immunity with regard to certain claims. (D.I. 53 at 11, 13, 15, 16) As the Court has found that Plaintiff's constitutional rights were not violated in these instances, the Court need not address the qualified immunity issue. *See Wolf v. Carroll*, C.A. No. 04-1385 (GMS), 2009 WL 1298324, at *3 n.8 (D. Del. May 8, 2009).

Breakhouse on December 24, 2008, after Breakhouse repeatedly threatened Plaintiff. (D.I. 1 at

4) This claim fails for at least two reasons. First, any Section 1983 claim in relation to this

incident is clearly time barred by the two-year statute of limitations, discussed above. Del. Code

tit. 10, § 8119; *McDowell*, 88 F.3d at 190. Second, as discussed above, claims against police

officers for failing to arrest or prosecute another individual are not cognizable. *Town of Castle

Rock, Colo.*, 545 U.S. at 767 n.13; *Segreti*, 2011 WL 284130, at *6.

Plaintiff also asserts a claim against Defendant Ralston on the basis of his supervisory

role of Defendant Stetser in connection with her investigation on March 5, 2011. (D.I. 1 at 4)

Again, this claim of supervisory liability is one asserting that Defendant Ralston had knowledge

of and acquiesced in Defendant Stetser's alleged violations of Plaintiff's constitutional rights.

(*Id.*) Any such claim, even were it cognizable after *Iqbal*, would necessarily include, as an

element, an actual constitutional violation by the supervisor's subordinate. *Kearney*, 2014 WL

1339665, at *9; *Young*, 2013 WL 1290950, at *10. As discussed above, Plaintiff has failed to

show such a violation by Defendant Stetser. Therefore, Plaintiff cannot maintain an action

against Defendant Ralston on the basis of supervisory liability. *See Kearney*, 2014 WL 1339665,

at *9; *Young*, 2013 WL 1290950, at *10.

Plaintiff additionally appears to assert a civil conspiracy charge against Defendant

Ralston in connection with the March 7, 2011 arrest. (D.I. 1 at 4) However, this claim fails for

the same reasons as discussed above regarding Defendant Stetser—there is no record evidence

showing that Defendant Ralston was personally involved in that subsequent arrest, and Plaintiff's

conclusory allegations fail to state a civil conspiracy claim.

Finally, Plaintiff appears to assert a retaliation claim against Defendant Ralston. (D.I. 1 at

67

4) However, all that is alleged in this regard is that he "retaliated against" Plaintiff, with no further factual detail put forward in support of this claim. (*Id.*) "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under [S]ection 1983." *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990); *see also Manuel v. Atkins*, 948 F. Supp. 2d 401, 404 (D. Del. 2013). But for a plaintiff to establish a retaliation claim, she must show that (1) she engaged in protected activity; (2) she was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Manuel*, 948 F. Supp. 2d at 404-05. Plaintiff has failed to even identify these elements, let alone support them with facts. Thus, this claim must fail as a matter of law.

### k.   DSP Troop 7

Plaintiff also asserts claims against DSP Troop 7 for a variety of alleged violations dating back to 1998. (D.I. 1) As was previously noted above, Plaintiff accuses DSP Troop 7 (based on the actions of the officers working for that entity) of, *inter alia*:  failing to respond to discovery requests, pulling her over without probable cause, failing to respond to her 911 calls, calling her names, discriminating against her because of her religious beliefs, giving preferential treatment to other individuals, and filing numerous false and unsubstantiated charges against her. (*Id.*) In some instances, Plaintiff does not identify any specific officers that were involved in these incidents, and in other instances, she references officers that she has not sued in this action. Defendants argue *inter alia*, that the Eleventh Amendment bars suits brought against the DSP. (D.I. 53 at 19)

"Absent a state's consent, the [E]leventh [A]mendment bars a civil rights suit in federal

court that names the state as a defendant[.]" *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981). The State of Delaware has not waived its sovereign immunity under the Eleventh Amendment. *Buchanan v. Gay*, 491 F. Supp. 2d 483, 493 (D. Del. 2007). Additionally, the Eleventh Amendment limits federal judicial power to adjudicate lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984); *Neeley v. Samis*, 183 F. Supp. 2d 672, 678 (D. Del. 2002). Further, a state agency is not a "person" subject to claims under Section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Buchanan*, 491 F. Supp. 2d at 493.

There is no dispute that the DSP is an agency of the State of Delaware. *See Campbell v. Del. State Police*, Civ. Action No. 13-1675-GMS, 2013 WL 6852350, at *2 (D. Del. Dec. 27, 2013); *Cannon v. Del.*, Civ. No. 11-1257-GMS, 2012 WL 1657127, at *6 (D. Del. May 9, 2012). Delaware courts have consistently held that the DSP is immune from suit pursuant to Eleventh Amendment immunity. *See, e.g., Campbell*, 2013 WL 6852350, at *2; *Cannon*, 2012 WL 1657127, at *6; *Buchanan*, 491 F. Supp. 2d at 493; *Yarnall v. Mendez*, 509 F. Supp. 2d 421, 429 (D. Del. 2007). Delaware's sovereign immunity therefore bars Plaintiff's claims against DSP Troop 7.

### 1.    **Official Capacity Claims**

Plaintiff has sued the Individual Defendants in both their individual and official capacities. (D.I. 1 at 7) Defendants also move for summary judgment on Plaintiff's official capacity claims against the Individual Defendants. (D.I. 53 at 19-20) The Eleventh Amendment bars suits against states, and claims made against state officials in their official capacities are

treated as claims made against the state itself. *Yarnall*, 509 F. Supp. 2d at 429.  Here, the State

of Delaware has not consented to Plaintiff's lawsuit or waived its immunity.  Therefore,

Defendants are entitled to summary judgment on Plaintiff's claims for monetary damages against

the Individual Defendants in their official capacities, as these claims are barred by the Eleventh

Amendment. *See id.*

### m.    Remaining Claims

Plaintiff asserts several additional claims against multiple Defendants in similar fashion,

and therefore it is most efficient to deal with these claims together.

### (1)    Abuse of Power/Abuse of Process

Plaintiff asserts claims for "abuse of power" against Defendants Layfield, Warrington,

O'Neil, Barnett, Hardy, Stetser, and Ralston.  (D.I. 1 at 2-6)  As an initial matter, there is not a

separate legally cognizable claim of "abuse of power" under federal law. *See, e.g.*, *Bravo v.*

*Bexar Cnty., TX*, No. 12-CV-4009 (MKB), 2014 WL 1155302, at *8 (E.D.N.Y. Mar. 21, 2014);

*McGee v. McMillan*, No. 1:12-CV-260, 2013 WL 3912572, at *8 (E.D. Tenn. July 29, 2013);

*O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 426 (S.D.N.Y. 2004).  To the extent that

Plaintiff's "abuse of power" claims could be construed as alleging substantive due process

violations against these Defendants, governmental conduct only violates an individual's

substantive due process rights if it amounts to an abuse of official power that "shocks the

conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Butler v. Thompson*, Civil

Action No. 2:13-cv-0532, 2014 WL 556257, at *5 (W.D. Pa. Feb. 13, 2014).  Plaintiff has not

shown that any of these Defendants' actions rise to such a level.  Indeed, as explained above, the

Court has not found any constitutional violations due to the challenged conduct of these

Defendants.

To the extent Plaintiff intended to assert state law claims regarding the tort of "abuse of process" against these Defendants (rather than "abuse of power"), such claims must also fail. To establish an abuse of process claim under Delaware law, a plaintiff must prove: "(1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceedings." *Esposito v. Townsend*, C.A. 12C-08-006 (RBY), 2013 WL 493321, at *5 (Del. Super. Ct. Feb. 8, 2013) (internal quotation marks and citation omitted). "[S]ome definite act or threat, not consistent with process, or designed for an illegitimate objective in the use of process, is required." *Chase Bank USA, N.A. v. Hess*, C.A. No. 08-121-LPS-MPT, 2013 WL 867542, at *4 (D. Del. Mar. 7, 2013). "Some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, must also be shown." *Id.* Plaintiff's Complaint and briefing not only fail to recite the elements of an abuse of process claim, but also fail to put forward facts sufficient to demonstrate the requisite ulterior purpose and willful act by any of these Defendants necessary to make out a claim. (D.I. 1); *cf. Terrell v. Del. State Univ.*, Civ. A. No. 09-464 (GMS), 2010 WL 2952221, at *6 (D. Del. July 23, 2010) (granting motion to dismiss abuse of process claim where plaintiff's complaint merely recited the elements of an abuse of process claim and did not include supporting factual allegations); *Wiers v. Barnes*, 925 F. Supp. 1079, 1093-94 (D. Del. 1996) (granting summary judgment on abuse of process claim where plaintiff "failed to allege facts sufficient to demonstrate an ulterior purpose in initiating the prosecution against him").[42]

----

[42]     It might be possible to construe Plaintiff's allegations against Defendant Layfield as suggesting an abuse of process claim that tracks the elements of that claim. (*See* D.I. 1 at 3-4, 9 (alleging that Defendant Layfield arrested Plaintiff as a means of "'payback'" for Plaintiff

### (2)   Harassment

Plaintiff accuses multiple Defendants (specifically, Defendants Layfield, Warrington,

O'Neil, Barnett, Hardy, and Ralston) of harassment. (D.I. 1 at 3-6)  However, there is no civil

cause of action for a claim of harassment in Delaware, *McCambridge v. Bishop*, CA. No. 09C-

02-030 FSS, 2009 WL 3068915, at *3 & n.6 (Del. Super. Ct. Sept. 23, 2009), and Plaintiff does

not otherwise articulate how her allegations would amount to a state law violation.  These claims

therefore fail as a matter of law.

### (3)   Slander

Plaintiff also asserts that multiple Defendants (specifically, Defendants Layfield,

Warrington, Rowley, and O'Neil) slandered her. (D.I. 1 at 3-6)  Under Delaware law, "[s]lander

requires proof of the following elements:  (1) the defamatory character of the communication; (2)

publication; (3) that the communication refers to the plaintiff; (4) the third party's understanding

of the communication's defamatory character; and (5) injury." *Lorenzetti v. Hodges*, C.A. No.

S10C-07-007 RFS, 2012 WL 1410103, at *5 (Del. Super. Ct. Jan. 27, 2012).  Additionally,

"[s]pecial damages must be pled in a claim of slander except for statements that malign one in a

trade, business or profession, impute a crime, imply that one has a loathsome disease or impute

the chastity of a woman." *Id.*  In each instance, when Plaintiff references a claim of slander, she

offers little factual support for the claims, such as what comments were made, to whom, or how

---

filing a complaint against another officer))  However, even it that were so, and even if Plaintiff
could point to record evidence substantiating her allegations, the claim would be barred by the
two-year statute of limitations for such claims. *See Hurst v. State Farm Mut. Auto Ins. Co.*, Civ.
Action No. 10-1001-GMS, 2012 WL 426018, at *7 (D. Del. Feb. 9, 2012).  Defendant Layfield
obtained the arrest warrant for Plaintiff's arrest on March 24, 2007 and Plaintiff was
subsequently arrested on March 26, 2007, (D.I. 54 at A31), but Plaintiff did not file her
Complaint in this action until January 23, 2012, (D.I. 1).

such comments caused harm to Plaintiff. Her responsive brief does not remedy these shortcomings, nor does it point out evidence of record in support of such claims. In the absence of any facts of record asserted to substantiate Plaintiff's conclusory allegations, her claims of slander against these Defendants must fail as a matter of law.

### (4)    Discrimination

Plaintiff further generically alleges that Defendants O'Neil and Whaley discriminated against her. (D.I. 1 at 2, 6)  Again, however, Plaintiff's allegations are vague and conclusory, and she fails to support them—in her Complaint, responsive brief, or otherwise—with any facts demonstrating that the Defendants are liable for the alleged misconduct. For instance, Plaintiff does not explain how or why she believed that these Defendants discriminated against her, or even identify what protected characteristic was the basis of her claim. For these reasons, Plaintiff's discrimination claims against Defendants O'Neil and Whaley fail as a matter of law.

### (5)    Negligence

Additionally, Plaintiff at times states in her Complaint that Defendants Warrington, Whaley, Hardy, Stetser, and Ralston were "negligent" in some way. (D.I. 1 at 2, 4-6)  It may be hard to read these isolated statements as clear expression of an intent to assert a claim for negligence, but to the extent they were meant to, "[n]egligence claims are not properly included in a civil rights action under [Section] 1983." *Dalton v. City of Wilmington*, Civ. No. 08-581-SLR, 2008 WL 4642935, at *2 (D. Del. Oct. 20, 2008); *see also Daniels v. Williams*, 474 U.S. 327, 332 (1986).  Therefore, Plaintiff's allegations of negligence on the part of these Defendants fail to show entitlement to relief, as negligent conduct fails to state a cognizable Section 1983 claim.

73

To the extent that Plaintiff intends to assert state law negligence claims against these officers, such claims are, *inter alia*, precluded by the Delaware County and Municipal Tort Claims Act. Del. Code tit. 10, § 4010 *et seq.* This statute provides that "all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." *Id.* § 4011(a). An employee may be liable, however, where his actions or omissions: (1) cause bodily injury, death, or property damage; and (2) such acts or omissions were not within the scope of employment or were performed with wanton negligence or wilful and malicious intent. *Id.* § 4011(c). Plaintiff does not allege or point to sufficient evidence to demonstrate that Defendants Warrington, Whaley, Hardy, Stetser, and/or Ralston's actions met both of these requirements. Therefore, the Defendants are immune from negligence claims asserted under Delaware law. *Id.*; *see also Chambers v. Doe*, 453 F. Supp. 2d 858, 872 (D. Del. 2006).

### (6)    Whistleblower Violations

Plaintiff's Complaint also makes a vague reference to "whistleblower violations." (D.I. 1 at 1) To the extent Plaintiff intended to bring a whistleblower claim under Delaware state law, her claim fails, as that she is not a "employee" or "public employee" of DSP under the law. Del. Code tit. 19, § 1703; Del. Code tit. 29, § 5115. Plaintiff fails to further flesh out this claim, and it therefore otherwise fails as a matter of law.

### (7)    Conclusion

Thus, the Court recommends that summary judgment be granted in favor of these Defendants with respect to the above remaining claims.

## IV.    CONCLUSION

For the reasons set forth above, the Court recommends that Defendants' Motion for Summary Judgment be GRANTED-IN-PART and DENIED-IN-PART.  Specifically, the Court recommends that Defendants' Motion be GRANTED as to all claims except for the Section 1983 illegal search and seizure claim asserted against Defendant Rowley.  Additionally, the Court DENIES Plaintiff's request for discovery pursuant to Rule 56(d).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1) and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: July 11, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE